992 P.2d 723

**STATE of Hawai'i, Plaintiff–Appellant,**

v.

**Felix A. AUGAFA, Defendant–Appellee**

**No. 21364.**

Intermediate Court of Appeals of Hawai'i.

Dec. 22, 1999.

---

James Anderson, Deputy Prosecuting Attorney, City and County of Honolulu, for plaintiff-appellant.

Joyce Matsumori–Hoshijo, Deputy Public Defender, for defendant-appellee.

Edward C. Kemper (Kemper & Watts), on the brief, Honolulu, for amicus curiae.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by ACOBA, J.

We hold that at the hearing to suppress evidence initiated by Defendant–Appellee Felix A. Augafa (Defendant), Plaintiff–Appellant State of Hawai'i (the State) established a legal basis for the arrest of Defendant and for the recovery of drugs from his person. We further hold that under the circumstances of this case, open and visible video camera surveillance of the public sidewalk area on which Defendant was situated was not violative of Defendant's constitutional right against unreasonable searches, seizures and invasions of privacy under article I, section 7 of the Hawai'i Constitution. While the first circuit court (the court) concluded no constitutional violations occurred, it suppressed the evidence in the exercise of its inherent supervisory power over criminal prosecutions because the "interests involved

are serious enough" and the "capabilities of the ... technology ... varied enough to require legislation ... authorizing use of this technology prior to its actual implementation."

■ We conclude however that while the court's inherent supervisory power may be invoked to suppress illegally obtained evidence, it cannot be exercised to suppress legally obtained evidence for the purpose of spurring the adoption of particular laws, however salutary such legislation may appear to be. Accordingly, we reverse the court's February 17, 1998 order which suppressed evidence and statements obtained from Defendant.

Finally, if as the court implies it believed the prosecution and police had misrepresented the existence of videotape recordings in other cases, it could as part of its adjudicatory function, exercise supervisory power to fashion appropriate measures for misconduct in those and future cases and/or in each case impose judicial sanctions plainly available to it.

I.

On February 28, 1997, Defendant was charged by complaint with Promoting a Dangerous Drug in the Third Degree in violation of Hawai'i Revised Statutes (HRS) § 712–1243 (1993).[1]

On April 1, 1997, defense counsel filed a "Motion to Preserve, Produce and Compel Evidence and Testimony," in which he requested "all surveillance [video]tapes taken and/or used by the State in the Downtown area, including those of [Defendant] and/or police informants having verbal and/or physical contact with [D]efendant immediately preceding his arrest on these charges." The motion was heard on April 15, 1997.

Pursuant to a written order issued on May 9, 1997, the court granted the motion. In the written order, the court stated that "[s]urveillance videotapes taken and used by the

1. Hawai'i Revised Statutes (HRS) § 712–1243(1) (1993) provides that "[a] person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount."

Under HRS § 712–1240 (1993), a "dangerous drug" means "any substance or immediate precursor defined or specified as a ... 'Schedule II substance' ... under chapter 329[,] which includes cocaine."

State are discoverable under [Hawai'i Rules of Penal Procedure (HRPP)] Rule 16[.]" The minutes from the proceedings of April 15, 1997, which are a part of the record, state that "[the] State ha[d the] video[tape] in Cr. # 97–0419 and w[ould] turn over [a] copy to [defense counsel]." Further, "if [there was] no [video]tape, [the] prosecutor need[ed] to notify [defense counsel] in writing why [the [video]tape was] not available."

On August 5, 1997, Defendant moved to suppress evidence recovered from him and statements he made at the time of his arrest on February 18, 1997, and for return of property seized. Defendant's motion contended that the use of a surveillance camera constituted an unconstitutional search under the Hawai'i Constitution. In his attached declaration, defense counsel asserted that "cameras used and monitored by the police were placed without warrants in receptacles throughout the Chinatown area" and Defendant was the subject of camera surveillance. Counsel stated that within five seconds after Defendant was observed on camera "passing something to a woman[,]" an officer on a bicycle rode up to him and arrested Defendant on the basis of two traffic warrants. Counsel maintained that "[t]he sighting, the items in [Defendant's] hand, and all that was derived therefrom should be suppressed as the fruit of the illegal monitoring that occurred on February 18, 1997." [2]

The hearing on Defendant's suppression motion was held on September 2, 1997, and later continued to September 16, 1997. At the beginning of the September 2 hearing, defense counsel asked "what the prosecution's position was about the existence of the [video]tape because it was [his] understanding from the [c]ourt there were [sic] none." The deputy prosecuting attorney (the prosecutor) responded, "I'm not aware of any. I

understand that [defense counsel] has got [sic] a [video]tape here in the courtroom, which I find astonishing, I'm not—I'm not aware of any [video]tape."

Police Officer Kyong Kim (Kim) then went on to testify that on February 18, 1997, he was assigned to the bicycle detail in downtown Honolulu. Kim related that before beginning his patrol, he was in the Chinatown police sub-station learning how to operate the recently installed video camera which scanned the Hotel Street area. Kim stated that while operating the video camera, he momentarily saw on the video screen Defendant located at the front of an establishment called "Two Jacks Bar" (the bar). According to Kim, Defendant was not engaged in any suspicious activity.

Kim testified he then went out on routine patrol. Circling the block, he saw Defendant in the same place he had earlier observed him to be on the video screen. Kim explained that because he had previously assisted another officer in arresting Defendant for a drug offense, he returned to the substation to determine if any outstanding arrest warrant for Defendant existed.[3] Kim related that upon finding two outstanding traffic warrants, he returned to Defendant's location and placed him under arrest.

Kim stated that Defendant was seated on a small step in front of the bar and as he approached, Defendant appeared to be "kind of apprehensive . . . like he wanted to get out of the area[.]" According to Kim, Defendant kept one or both of his hands clenched in a fist.[4] Kim explained that he then ordered Defendant to remain in his "seated position[,]" and about twenty minutes later, received the report numbers for the warrants

---

2. Also on August 5, 1997, defense counsel submitted a discovery request which included a request for "[a]ny books, papers, documents, photographs, or tangible objects which the prosecutor intends to introduce, or . . . are material to the preparation of the defense[.]"

3. Police Officer Kyong Kim (Kim) testified that he would do "random [warrant] checks of people that [he] kn[ew] that [he had] encountered before in Chinatown[.]"

4. During the hearing, Kim testified that Defendant–Appellee Felix A. Augafa (Defendant) "had one of his hands in a closed fist[.]" However, in Kim's affidavit in support of the extended restraint of Defendant, he indicated that he "observed that [Defendant] had both his hands closed in a fist like manner."

from police dispatch.[5] At that time he ordered Defendant to stand and then handcuffed him. Kim asserted that when he was handcuffed, Defendant opened one of his hands, disclosing a "rock-like substance" in it. Kim recovered the substance which was later determined to be rock cocaine.

On cross-examination, Kim disclosed that he did not know a recording was being made when he operated the video surveillance equipment; he thought it was "just a test phase for the camera." Additionally, he acknowledged that he knew of no guidelines or procedures relating to its operation. However, he maintained it was not his intent "to watch the camera until [he] observed a suspicious transaction and then [to] arrest" the suspect. According to Kim, Defendant "just happened to be on the screen when the camera was pointed in that direction." The following examination by defense counsel took place:

Q [DEFENSE COUNSEL]: Okay. And now, are you sure you confirmed the-did you see a suspicious hand-to-hand transaction with your own eye[s]?

A [KIM]: Involving who, sir?

Q: Involving [Defendant] and a woman?

A: *No.*

Q: Were you told of such a transaction by somebody who was monitoring the camera?

A: I can't remember.

Q: Because in the sequence of events, isn't it true that you arrived on the scene seconds after she left?

A: I don't know. I don't remember. Is that in my report?

Q: No. In fact, there's nothing about the camera you mentioned in your report at all, was there?

A: Yeah, because I viewed no violation with the camera, so I didn't feel it was necessary to place that in my report.

Q: Okay. *But if you had heard about a violation occurring by means of the camera,* wouldn't you think it would be important to put that in your report?

A: *Probably, yeah.*

(Emphases added.)

Kim agreed that the camera was "movable[,]" and could "track an individual up and down the street[.]" He also concurred that the camera had "zoom" capability and could "get the view of being right next to the person[.]" Kim didn't "think [the equipment] could pick up any sound." Additionally, Kim did not know whether the camera had "enhanced nighttime viewing" capability because he had never used it at night.

The following exchange about Kim's decision to arrest Defendant was initiated by the court:

THE COURT:—I'm puzzled about one thing. If you saw [Defendant] on the monitor while you were kind of fussing with the-before you began your routine patrol, why didn't you check for warrants then?

[KIM]: I just didn't, ma'am. I just went back on patrol, and I just saw him hanging around the same area again, and that's—I thought, okay, he might be up to no good or whatever, so I said okay. I think I'm going to run a check on him just in case.

But when I first saw him on the screen, it was like—we just was [sic] playing around with the camera, oh, there's [Defendant] hanging around in front of [the bar] and, okay, that's the way the camera works, fine.

Then I just went back on patrol, went around the block, hey, [Defendant] is hanging around the same area again. Okay, let's go—just go run a check on him, see what he's up to; *so that's what made me run the check, anyway.*

(Emphasis added.)

After Kim's testimony, defense counsel moved to have the videotape received in evi-

---

5. Kim explained that there is a three-stage process associated with arrest warrants: (1) determining if there are any outstanding warrants through the computer; (2) requesting confirmation of the warrants; and (3) obtaining the police report numbers associated with the warrants.

Accordingly, although Kim had already determined that Defendant had two outstanding warrants through the computer at the sub-station, it was not until he received the report numbers from police dispatch that he proceeded to arrest Defendant.

dence, arguing that it was "self-authenticating." However, the prosecutor maintained, "[T]his is the first time I've known of the existence of this tape and would be most interested in knowing how [defense counsel] came by it." Defense counsel stated, "I believe it was through the Prosecutor's Office. I think it was done inadvertently." The prosecutor responded, "[T]hat may[ ]be the case in which I'm just ignorant of the discovery[.]" Since the prosecutor had not seen the videotape and was unable to comment on its contents, the court "instruct[ed]" him to view it before the next court date.

At the continued hearing on September 16, 1997, the videotape was stipulated into evidence. Defense counsel argued that Kim confronted Defendant within seconds of an alleged drug transaction because other officers monitoring the video camera had informed Kim that "there was a passing." According to counsel, Kim then held Defendant in custody until he revealed the rock cocaine in his hand. The arrest, counsel contended, was the fruit of what the police observed on the video camera and the use of the camera violated Defendant's right against unreasonable searches and seizures and right to privacy under the Hawai'i Constitution. He warned then, that "[c]ases are going to be made by the observation of those cameras, and [the fact that the cameras were used] will never show up in the police reports; and the plain view doctrine will be perverted to circumvent the warrant requirement." Counsel maintained that "[f]rom now on, everytime something is seen on that camera and relate [sic] through [sic] his loyal peers driving . . . around Chinatown, that officer's going to say I saw it. That officer's going to say I did this, and that camera is never going to come into the picture[.]"

On February 17, 1998, the court entered its findings of fact (findings), conclusions of law (conclusions), and order granting Defendant's motion to suppress evidence and state-

ments and denying his request for return of property.[6] The court made six findings:

1. On February 18, 1997, [Kim] was a member of the Chinatown bicycle detail. On that day, *prior to starting his routine patrol, [Kim] saw [Defendant] on a video screen at the Chinatown police sub-station.* Defendant was in front of [the bar], an establishment within a block of the sub-station. *[Kim] recognized Defendant from a previous drug arrest* in which [Kim] assisted another officer.

2. *According to [Kim], he began his patrol, saw Defendant again, returned to the sub-station to check whether Defendant had any outstanding warrants and remained at the sub-station to confirm that Defendant had one outstanding warrant.* He then returned to the front of [the bar] to arrest Defendant on the strength of that warrant. Throughout the encounter with [Kim], Defendant had one hand closed in a fist which Defendant opened after being handcuffed.

3. It is undisputed that Defendant had pieces of rock cocaine in that hand.

4. *Nearly all of this entire episode was recorded on video tape by the Honolulu Police Department [ (HPD) ] (Defense Exhibit A).* The video tape ended prior to [Defendant]'s arrest.

5. The video camera was mounted on a pole protruding from the sidewalk, with a height equivalent of a low two[-]story building, across the street from [the bar]. The camera could swivel and in fact the video was able to track a woman from [the bar] down the block toward a bus stop along the sidewalk. Presumably, the control for the position of the camera is in the Chinatown sub-station.

6. Because the camera was operating and recording during the same "real time" covered by [Kim's] testimony, and because he was either aware of the scene being viewed, or was in the vicinity of the cam-

---

**6.** The order provided as follows:

THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that [Defendant's] MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND RETURN OF PROPERTY is hereby granted in part and denied in

part. It is granted insofar as all evidence recovered from [Defendant] and all statements attributed to [Defendant] are hereby suppressed. However, the motion is denied in that no property shall be returned to [Defendant].

era/video record and/or in police radio contact with those officers in the sub-station, *the court imputes the knowledge recorded on the video to [Kim].*

(Emphases added.)

The court made no findings concerning the contents of the videotape as it related to the alleged drug transaction.

It rendered the following pertinent conclusions:

20. This court finds that, *notwithstanding the ability of the [S]tate to survive a constitutional challenge,* the interests involved are serious enough and the "day-to-day" capabilities of the simple technology involved is varied enough to require *the court to exercise its inherent authority to require legislation (either through the City Council or the State Legislature) authorizing the use of this technology prior to its actual implementation. The legislation must allow for general legislative oversight over the method of its use* (including the use of the "products" of the technology, *i.e.,* video tapes) *and require the promulgation of executive agency rules and regulations* over the specific procedures of the technology's use.

21. The model for this ruling rests on the statutory provisions regarding intoxication control roadblocks found in [HRS] § 286–162.5 and § 286–162.6 (1984). [HRS] § 286–162.5 is the authorization provision, subjecting the programs to minimum standards set forth in the statute. . . .

. . . .

23. [An article by Christopher Slobogin, "Technologically–Assisted Physical Surveillance: The American Bar Association's Tentative Draft Standard," 10 Harv. J.L. & Tech. 383 (Summer 1997)] includes a very interesting critique of the existing case law as well as the use of the judicial process as the descision [sic] making "vehicle" to establish standards and rules. . . . Shortly after [HPD] set up these cameras in the Chinatown area, motions to suppress were filed in various cases challenging this practice. Many of the cases did not continue with the motions apparently because the defendants changed their plea. On the master calendar pre-trial motions docket, only this case and one preceding case continued to disposition *because, as represented by various deputy prosecutors, the cameras were dismantled shortly after they were mounted. The court takes judicial notice of an earlier case, State v. Burgo,* Cr. No. 97–0528, *in which the deputy prosecutor as well as the testifying police officer represented to [the court] that video tapes were not available to the Chinatown sub-station for use with the video cameras.* Because the court, at that time, accepted the representations of both prosecutor and police officer and because there was a basis for denying the motion, the court did so. *Obviously, as reflected by this record, tapes were available.* This "minor detail" illustrates the problem of a trial court attempting to provide appropriate and effective oversight in this area [of video surveillance].

(Emphases added.)

The court's suppression of evidence and statements was based on the exercise of its "inherent supervisory power":

25. The [Hawai'i] Supreme Court recognizes that courts in this [s]tate have "inherent supervisory power over criminal prosecutions to ensure [that] evidence illegally obtained by government officials or their agents is not utilized in the administration of criminal justice though the courts." *State v. Pattioay,* 78 Hawai'i 455, 468, 896 P.2d 911, 924 (1995) (citing *State v. Santiago,* 53 Haw. 254, 264, 492 P.2d 657, 663 (1971) (internal citations omitted)). . . . Without the prerogative to call on these inherent powers, the courts would be paralyzed in performing their "essential function of adjudicating cases in a fair manner and from protecting their integrity and independence." *Id. Consistent with these policies, [Defendant's] statements and all evidence recovered from [Defendant] must be suppressed under the authority of this court's supervisory powers* in the administration of criminal justice in the courts of this state.

(Emphasis added.)

The State appealed from the above order.

## II.

It is evident from the foregoing findings and conclusions that the court found no constitutional or statutory violations in the use of the video camera. However, based upon what it apparently perceived as misrepresentations by the State as to the existence of videotape recordings in cases before it, the court sought under its "inherent supervisory power" to prevent such conduct by "requir[ing]" the appropriate legislative bodies to adopt measures governing the use of video camera surveillance. While we understand the court's concerns, we conclude, ultimately, that the solution it chose was outside the scope of such power, and that on the record in this case, Defendant has not sustained his burden of proving the evidence and statements must be suppressed.

## III.

On appeal, the State argues that the court erred in granting Defendant's motion to suppress evidence because (1) Defendant had no expectation of privacy on a public street; (2) the videotaping did not constitute a search; and (3) the court had no legal basis to suppress the evidence under its inherent powers.

## IV.

### A.

We first consider the State's challenge to finding No. 6, in which "the court imputed the knowledge recorded on the video to Officer Kim."

A court's findings of fact in a pretrial ruling are reviewed according to the following standard:

> Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is left with a definite and firm conviction that a mistake has been made.

*State v. Balberdi*, 90 Hawai'i 16, 20–21, 975 P.2d 773, 777–78 (App.1999) (internal quotation marks and citation omitted)

With respect to imputed knowledge, our supreme court held in *State v. Barnes*, 58 Haw. 333, 568 P.2d 1207 (1977), that "[w]hile police officers are acting in concert and are keeping each other informed of the progress of a particular investigation, the knowledge of each is deemed to be the knowledge of all." *Id.* at 336, 568 P.2d at 1210 (citing *State v. Pokini*, 45 Haw. 295, 367 P.2d 499 (1961); *United States v. Bianco*, 189 F.2d 716 (3d Cir.1951); *Williams v. United States*, 113 U.S.App. D.C. 371, 308 F.2d 326 (D.C.Cir. 1962); *United States v. Pitt*, 382 F.2d 322 (4th Cir.1967)).

Similarly, in *State v. Pestana*, 59 Haw. 375, 581 P.2d 758 (1978), an officer saw the defendant enter a car with the butt of a gun protruding above the waistband of his shorts place an "object" under a seat of the car, and then emerge from the vehicle with the gun butt no longer visible. The officer directed another officer to recover the gun from the area where he had seen the defendant place the "object." *Id.* at 376, 581 P.2d at 759. The Hawai'i Supreme Court refused to set aside the court's factual determination that the officer "had directed his fellow officer to the exact location of the firearm" because it was not "clearly erroneous." *Id.* at 377, 581 P.2d at 758. It decided that "both officers were working together, and the recovery of the pistol by [one officer] was made pursuant to the [other officer's] directions" and, therefore, the knowledge of the officer who witnessed defendant's conduct would be imputed to the other officer for purposes of establishing probable cause for a warrantless search. *Id.; see State v. Bunker*, 67 Haw. 174, 177, 681 P.2d 984, 987 (concluding that where police officers are acting in concert, knowledge of one may be properly imputed to the other for determining probable cause to make an arrest), *reconsideration denied,* 67 Haw. 684, 744 P.2d 779 (1984).

### B.

■ As distinguished from the preceding cases, we conclude the court was mistaken in imputing the knowledge recorded on the vid-

eotape to Kim because the record lacks substantial evidence to that effect. Kim testified at length about his initial observation of Defendant on the video screen and the second observation in the street which prompted him to ascertain the existence of arrest warrants for Defendant. Kim indicated that Defendant's subsequent arrest was not induced by his recognition of Defendant on the video monitor. Rather, Kim decided to run a warrant check on Defendant after he observed Defendant in front of the bar during his patrol.

The sub-station officers' knowledge of the videotape contents could not be imputed to Kim unless it was demonstrated that the officers were "acting in concert" with Kim by keeping him "informed" of Defendant's actions. Without such evidence, the other officers' knowledge of the events recorded could not be imputed to Kim. The record does not contain substantial evidence that anyone communicated with Kim or relayed information to him concerning the purported drug transaction captured on videotape.[7]

When questioned about whether he was informed of a "suspicious hand-to-hand transaction ... by someone who was monitoring the camera," Kim stated that the substation officers did not "keep in contact with [him] about what they were watching." Kim could not remember whether the other officers informed him of the supposed drug transaction between Defendant and his customer, but

stated that he did not see a suspicious transaction with his own eyes. Further, although others may have continued monitoring the video screen, Kim denied he asked the other officers to "keep an eye on [Defendant] while [he conducted a] computer check."

Based on Kim's testimony, the record does not demonstrate that he was "acting in concert" with the other officers or that officers at the substation communicated their observations of Defendant's actions in a purported drug transaction. Kim's inability to remember some details is insufficient to support the court's finding that because Kim was "aware of the scene being viewed, or was in the vicinity of the camera/video recorded and/or in police radio contact with those officers in the sub-station[,]" knowledge of what was viewed on the video camera should be imputed to him. What Kim viewed himself was not imputed knowledge. There is no evidence of what Kim learned while in the "vicinity" of the surveillance equipment, or of what if anything was communicated to him by radio concerning the videotaped events. Therefore, we conclude that the court erred in imputing "the knowledge recorded on the video[tape] to Kim." [8]

## C.

■ Although the knowledge of what might have been observed on the video

---

**7.** We note that if the court had found Kim not credible and determined from the circumstances that in fact police officers must have conveyed information to him and communicated with him, then it could infer that the officers were acting in concert and impute the knowledge recorded on the video to Kim. *State v. Balberdi*, 90 Hawai'i 16, 21, 975 P.2d 773, 778 (App.1999) (stating that "[a]n appellate court will not pass upon the trial judge's decisions with respect to the credibility of witnesses and the weight of the evidence, because this is the province of the trial judge") (citing *State v. Eastman*, 81 Hawai'i 131, 139, 913 P.2d 57, 65 (1996) (citation omitted)).

Considering the time that elapsed between Defendant's purported drug transaction and the actual arrest, it could be argued as Defendant contended, that Defendant's arrest was based upon the perceived drug transaction and that officers were waiting for the arrest warrants to justify their seizure of Defendant.

However, the court made no findings of facts or conclusions of law related to the issues of

Kim's credibility and Defendant's detention and neither party raises the issue of an illegal detention on appeal. Therefore, we are left with Kim's testimony that he initially saw Defendant on the video screen, went on his bike patrol, saw Defendant again in front of the bar, and then decided to run a warrant check on him. In light of Kim's unrebutted and unimpeached testimony, the issue of imputed knowledge simply does not arise.

**8.** The court's imputation of the videotape contents to Kim can only be reasonably understood in terms of the court's desire to obtain legislative "oversight" of video camera use and, therefore, to make such use pivotal to its ruling. The result, however, is a finding inconsistent with the evidence presented. Had, as we indicated, the court found Kim's testimony as to the basis for the arrest lacking in credibility, the court's imputation to Kim of the videotape contents could not be found clearly erroneous.

monitor cannot be imputed to Kim, Defendant's arrest and the concomitant recovery of drugs from his person did not constitute an illegal seizure and search. Defendant was arrested pursuant to confirmed outstanding traffic warrants. The seizure of Defendant was authorized by the arrest warrants, and the search of Defendant's closed fist or recovery of drugs therefrom was valid as a search incident to arrest. *See State v. Wallace,* 80 Hawai'i 382, 403, 910 P.2d 695, 716 (1996)(stating that a "search and seizure without a valid warrant is per se unreasonable unless it comes within a recognized exception [to the fourth amendment's proscription against unreasonable searches and seizures] such ... [as] search incident to arrest") (citation omitted).

## V.

It is not evident from its findings whether the court found that probable cause to arrest Defendant stemmed from the warrant testimony of Kim or the purported transaction on the videotape. As we have pointed out, the court made no finding concerning the recording of the alleged drug transaction on the videotape. However, its conclusion No. 4 rests on the contents of what the videotape purportedly disclosed as to Defendant's "subjective expectation of privacy while dealing drugs on a busy public sidewalk[.]" The briefs of Defendant and amicus curiae implicitly assume, along with the court, that the events of the purported drug deal transpiring at the time of the recording constituted probable cause for Defendant's arrest. We proceed to decide the appeal in the posture in which it is presented to us by the parties; we do not determine whether the events seen on

the videotape established probable cause to believe a drug transaction occurred.

Under Kim's testimony as we have examined it, probable cause existed to arrest Defendant. The questions remaining are (1) whether the evidence must be suppressed because Defendant's right against unreasonable searches, seizures and invasions of privacy was violated, and if not, (2) whether the evidence should nevertheless be suppressed in the exercise of the court's "inherent supervisory power" over its cases.

## VI.

### A.

Our next inquiry then, is whether Defendant's constitutional rights were violated when Kim viewed Defendant on the video screen or *arguendo* when the alleged drug transaction was recorded. Similar to the " 'fourth amendment to the United States Constitution, article I, section 7 of the [Hawai'i] State Constitution protects people from unreasonable government intrusions into their legitimate expectations of privacy.' " [9] *Wallace,* 80 Hawai'i at 392, 910 P.2d at 705 (quoting *State v. Bonnell,* 75 Haw. 124, 136, 856 P.2d 1265, 1272 (1993) (citations omitted)). "The basic purpose ... of these constitutional provisions is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Id.* (citations omitted).

In the context of this case, " '[p]rivacy ... is not a fundamental right but [rather] a test of whether the prohibition against unreasonable searches and seizures [in article I, section 7 of the Hawai'i Constitution] applies.' " [10]  *Id.* at 393, 910 P.2d at 706 (quot-

---

9.  Article I, section 7 of the Hawai'i Constitution provides as follows:

> The right of the people to be secured in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

10.  Defendant indicated in his answering brief that the officers' use of the surveillance camera

constituted an unconstitutional search. This would implicate the prohibition against unreasonable searches, seizures and invasions of privacy under article I, section 7 of our state constitution. The State in its opening brief refers to article I, section 7 of the Hawai'i Constitution in analyzing whether the video surveillance violated Defendant's constitutional rights.

Defendant in his answering brief and the American Civil Liberties Union of Hawai'i Foundation in its amicus curiae brief refer briefly to article I, section 6 of the Hawai'i Constitution. Article I, section 6 of the Hawai'i Constitution states that "[t]he right of the people to privacy is

ing Stand. Comm. Rep. No. 15, *reprinted in* 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 1024 (1980)). In applying the "privacy test" we must decide whether a person's expectation of privacy under any particular set of circumstances may be deemed reasonable. To be deemed such, it must be established that "[f]irst, one must exhibit an actual, subjective expectation of privacy. Second, that expectation must be one that society would recognize as objectively reasonable." *Bonnell,* 75 Haw. at 139, 856 P.2d at 1273–74 (citing *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967) (Harlan J., concurring); *see also State v. Biggar,* 68 Haw. 404, 407, 716 P.2d 493, 495 (1986)) (other citations omitted); *State v. Lopez,* 78 Hawai'i 433, 441–42, 896 P.2d 889, 897–98 (1995). In this regard, "the proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his own ... rights were violated by the search and seizure sought to be challenged." *Balberdi,* 90 Hawai'i at 21, 975 P.2d at 778.

### B.

■ As to Defendant's actual and subjective expectation of privacy, the State challenges the court's conclusion No. 4 which concluded that "[t]he inescapable inference from viewing the video tape is that Defendant had some subjective expectation of privacy while dealing drugs on a busy public sidewalk." We review the trial court's conclusions of law de novo under the right/ wrong standard. *Bonnell,* 75 Haw. at 142, 856 P.2d at 1275; *See also Raines v. State,* 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller,* 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983); *see also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). Thus, a conclusion of law "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe,* 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citation omitted). As in many cases similar to this one, we believe that the crux of the privacy test is its second prong and we begin our analysis there.

### C.

Therefore, assuming *arguendo,* Defendant had an actual, subjective expectation of privacy, the question of "[w]hether ... [his expectation] is one that society would recognize as objectively reasonable is a question of law." *Bonnell,* 75 Haw. at 142, 856 P.2d at 1275; *See also Raines,* 79 Hawai'i at 222, 900 P.2d at 1289. We acknowledge that "'[a] person has a 'halo' of privacy wherever he goes and can invoke a protectable right to privacy wherever he may legitimately be and reasonably expect freedom from governmental intrusion.'" *Bonnell,* 75 Haw. at 143, 856 P.2d at 1275 (quoting *State v. Matias,* 51 Haw. 62, 65–66, 451 P.2d 257, 259, *reh'g denied,* 51 Haw. 270 (1969)).

■ But while "'[e]very individual has expectations of privacy with regard to his *person* wherever he may go ... this is not so with regards to *places* where an individual happens to be. The place must be of such a character as to give rise reasonably to these expectations of privacy.'" *Id.* (quoting *State v. Dias,* 52 Haw. 100, 106–107, 470 P.2d 510, 514 (1970) (emphasis in original)). In assessing the objective reasonableness of an expectation of privacy, we consider (1) "the nature of the area involved"; (2) "the precautions taken to insure privacy"; and (3) the "type and character of [the] governmental invasion" employed. *Id.*

recognized and shall not be infringed without the showing of a compelling state interest. The legislature shall take affirmative steps to implement this right. The right "'relates to privacy in the informational and personal autonomy sense.'" *State v. Wallace,* 80 Hawai'i 382, 393 n. 12, 910 P.2d 695, 706 n. 12 (1996) (quoting Stand.

Comm. Rep. No. 69, *reprinted in* 1 Proceedings of the Constitutional Convention of Hawai'i of 1979, at 674). Since Defendant contends that the use of the video camera was a search, we believe article I, section 7 is the provision pertinent to this case. *Id.*

### 1.

Concerning the nature of area involved, the Hawai'i Supreme Court has held that "where the object observed by the police is in 'open view' it 'is not subject to any reasonable expectation of privacy and the observation is not within the scope of the constitution.'" *Id.* at 144, 856 P.2d at 1276 (citing *State v. Kapoi*, 64 Haw. 130, 140, 637 P.2d 1105, 1113 (1981)) (quoting *State v. Kaaheena*, 59 Haw. 23, 29, 575 P.2d 462, 467 (1978)). "'In the "open view" situation ... the observation takes place from a non-intrusive vantage point. The governmental agent is either on the outside looking outside or on the outside looking inside [at] that which is knowingly exposed to the public.'" *Id.* (quoting *Kaaheena*, 59 Haw. at 28–29, 575 P.2d at 466–67).

According to *State v. Okubo*, 3 Haw.App. 396, 651 P.2d 494 (1982), *decision affirmed by*, 67 Haw. 197, 682 P.2d 79 (1984), Defendant may not assert a reasonable expectation of privacy with respect to "an object or activity which is open and visible to the public when the presence of members of the public may reasonably be anticipated." *Id.* at 410, 651 P.2d at 504 (concluding that the defendants had no reasonable expectation of privacy in videotapes of defendant's meetings held in "open view" with police officers); *see also State v. Brighter*, 60 Haw. 318, 322, 589 P.2d 527, 530 (1979) (holding that marijuana plants on the defendant's property that were visible from an open driveway were not subject of a reasonable expectation of privacy). That is the situation in this case.

In *United States v. Lopez*, 585 F.Supp. 1400 (D.Conn.1984), the defendant moved to "suppress evidence obtained ... by means of a high-powered telescopic device which recorded activities of defendant in a public street." *Id.* at 1400. The United States District Court held that the defendant did not have a reasonable expectation of privacy. *Id.* at 1401. While we do not agree with all aspects of the district court's decision, the district court there reasoned under analogous circumstances that the "[d]efendant cannot transform a public street into a 'private sphere'". *Id.* at 1400. It declared that the "[d]efendant cannot by unilateral action arbitrarily stake out a portion of the public

domain, declare it to be his to the exclusion of others, and thereby create a right of expected privacy for himself from observations." *Id.* at 1401.

In factual contrast, in *Bonnell*, the defendants, who were postal workers, moved to suppress evidence obtained as a result of a warrantless covert video surveillance of them in their "break room" at a post office. *Bonnell*, 75 Haw. at 131, 856 P.2d at 1270. The supreme court decided that the defendants had an objectively reasonable expectation of privacy in their break room because access to the room was limited to employees. *Id.* at 144, 856 P.2d at 1276. The government's video camera was located in a smoke detector and the observations were from the "inside looking inside." *Id.*

■ In light of the foregoing cases, we conclude that Defendant did not have a reasonable expectation of privacy in his location or *arguendo* in the purported transaction at the area involved. Defendant was on a public street fronting a bar in a heavily trafficked area. The police video camera was mounted on a pole protruding from the public sidewalk across the street from the bar. The videotape revealed Defendant on Hotel Street at approximately 6:30 in the evening among numerous pedestrians and several passing buses. Defendant cannot transform the "public street" into a "private sphere" by arguing that a right of expected privacy is invoked by his "unilateral action" of engaging in a drug deal. Further, as seen on the videotape, Defendant exposed and shifted objects from hand to hand and engaged in what appeared to be an open and obvious drug transaction. Defendant himself was in an "open view situation" and the alleged transaction was conducted in public. The observations preserved on videotape could easily have been viewed by anyone on the street; in this case, the police observed Defendant from the "outside looking outside." Therefore, considering the nature of Defendant's location, we conclude society would not view Defendant's expectation of privacy as objectively reasonable.

## 2.

Another factor in assessing the reasonableness of a person's expectation of privacy is the precautions taken to insure privacy. *Bonnell,* 75 Haw. at 143, 856 P.2d at 1275. In *State v. Jensen,* 69 Haw. 534, 750 P.2d 932 (1988), the Hawai'i Supreme Court held that the defendants' motion to suppress marijuana plants seized from their backyard was improperly granted because there could be no objectively reasonable expectation of privacy in it. *Id.* at 537, 750 P.2d at 933. There, an officer confirmed a neighbor's report of marijuana plants in the defendants' yard by looking through gaps in the neighbor's fence. *Id.* at 535, 750 P.2d at 932–33. The supreme court determined that the defendants "exhibited no reasonable expectation of privacy" because "the record shows that they did not build a fence, make any repairs on it, or attempt to provide any other screen from the neighbor's yard." *Id.* at 536, 750 P.2d at 933.

Similarly here, Defendant took no precautions to screen his presence or his activity from public view. Defendant sat in front of a bar on a crowded street. He made no attempt to conceal the items in his hands. Rather, Defendant tossed the objects in the air from one hand to the other. Further, Defendant exposed them on numerous occasions by opening and closing his hands. During the supposed transaction, Defendant was also engaged in conversation with another individual who sat with him in front of the bar before the "passing" and after the officers arrived. Defendant was apparently not concerned that others could observe his actions.

Moreover, the events captured on videotape contradict Defendant's argument that he "took reasonable precautions to conceal his drug dealing" and "scanned the area, presumably for police, then quickly transferred items in his hand to [his customer's hand]." On the videotape, the actual transfer was not quick and covert, but highly obvious because Defendant openly dropped the items into the female's hands. She, in turn, opened her hand to view the objects. In summary, Defendant failed to take precautions to conceal his actions such as conducting his activity in a less obvious manner or at a closed location.

## 3.

### a.

The final factor to be considered in determining whether an individual has a reasonable expectation of privacy is "the 'type and character of [the] government intrusion' employed." *Bonnell,* 75 Haw. at 143, 856 P.2d at 1275 (quoting *Jensen,* 69 Haw. at 536, 750 P.2d at 933 (citations omitted)) (brackets in original). "To measure the government's intrusion we must consider the expectations of society." *Id.* at 145, 856 P.2d at 1276 (citing *United States v. Cuevas–Sanchez,* 821 F.2d 248, 251 (5th Cir.1987)); *see Biggar,* 68 Haw. at 409, 716 P.2d at 496 (1986) (holding that a suspect's reasonable expectation of privacy inside a closed toilet stall was objectively reasonable, and violated by police detective standing on adjacent toilet and peering over partition). Therefore, before examining the type and nature of the government's intrusion, we consider first, the expectations of society as to activities carried on in open, public view.

In *Bonnell,* the Hawai'i Supreme Court recognized that " 'television surveillance is exceedingly intrusive . . . and that it could be grossly abused—to eliminate personal privacy[.]' " *Bonnell,* 75 Haw. at 146, 856 P.2d at 1277 (quoting *United States v. Torres,* 751 F.2d 875, 877 (7th Cir. 1984), *cert. denied,* 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985)). The supreme court indicated that "the employee break room was neither a public place nor subject to public viewing or hearing [and that o]nly postal employees and invited guests were allowed in it." *Id.* at 144, 856 P.2d at 1276. *See also State v. Lo,* 66 Haw. 653, 661, 675 P.2d 754, 760 (1983) (affirming the suppression of audio and video recordings obtained from equipment installed in a hotel room because the defendant's temporary abode constituted a "private place" "by virtue of his rightful presence").

This court held in *Okubo,* under dissimilar factual circumstances, that video tapes of the defendants' meetings with police officers were "constitutionally permitted." *Okubo,* 3 Haw.App. at 410, 651 P.2d at 504. This court reasoned that "all videotapes were taken of meetings held in 'open view' " and that "[n]o reasonable expectation of privacy can be as-

serted with respect to an object or activity which is open and visible to the public". *Id.*

*State v. Costin,* 720 A.2d 866 (Vt.1998), further supports the proposition that there is no objectively reasonable expectation of privacy where objects or activities are allowed to be publicly exposed. In *Costin,* the defendant moved to suppress a videotape of the defendant cultivating marijuana plants outside the curtilage of his house. The defendant claimed that "the warrantless video surveillance was unconstitutional". *Id.* at 867. The Vermont Supreme Court confirmed that the warrantless video surveillance did not violate its state constitution's search and seizure provision. *Id.* at 871. In its decision, the appellate court noted that the defendant's "marijuana plants observed by the video camera were located outside the curtilage of his house and thus were [in an] 'open field.' " *Id.* at 867. It deemed there was "no reasonable expectation of privacy in the area in which he tended his marijuana garden because he took no steps to exclude the public." *Id.* at 867, 869.

■ Here, the videotaping was of a public street with unlimited access and, therefore, Defendant's presence and/or transaction was "in a public place subject to public viewing or hearing." *Bonnell,* 75 Haw. at 144, 856 P.2d at 1276. Furthermore, as in *Costin* and *Okubo,* the videotaping of Defendant in front of the bar and/or of the purported drug transaction was "constitutionally permitted" as these events were held in "open view" and "visible to the public." *See Okubo,* 3 Haw. App. at 410, 651 P.2d at 504; *Costin,* 720 A.2d at 867, 869. Accordingly, under the circumstances in this case, there was no objectively reasonable expectation of privacy for persons, objects, or activities which were visible to the public and hence captured by the video camera.

### b.

The video surveillance would not violate a defendant's privacy rights if "[t]he video camera recorded only what an officer standing in the same position would have observed with the naked eye." *Costin,* 720 A.2d at 870 (citing *Vega–Rodriguez v. Puerto Rico Tel. Co.,* 110 F.3d 174, 181 (1st Cir.1997) (holding that "mere fact that the observation is accompanied by a video camera rather than the naked eye, and recorded on film rather than in . . . [observer's] memory, does not transmogrify a constitutionally innocent act into a constitutionally forbidden one")).

The court's finding that "[t]he video camera was mounted on a pole protruding from the sidewalk, with a height equivalent of a low two[-]story building, across the street from [the bar,]" is not contested on appeal. The question of whether what was recorded by the camera would have been visible to the naked eye is not squarely raised, except for one circumstance which we discuss *infra.* In the absence of such a challenge and facts relevant to that question, we must assume that what was largely recorded on the videotape would be observable by the naked eye, at least insofar as what was of significance to the result in this case.

In *Bonnell,* the supreme court pointed out that the camera was located in a "grossly intrusive vantage point." *Bonnell,* 75 Haw. at 145, 856 P.2d at 1276. This case is distinguishable. Here, the camera's location and vantage point were non-intrusive. The camera was mounted on a pole for all to see. It was plainly visible to Defendant and to those it surveilled. Its view took in what was already exposed to the public. The fact that the camera was not hidden but apparent and visible to all is underscored by videotape footage showing Defendant looking at the camera and pointing it out to his purported customer both shortly after transferring items to her and before she handed him something.

### c.

■ Related to the video surveillance, Defendant questioned whether the zoom capacity [11] of the camera intruded upon his privacy. The videotape reveals that the camera zoomed in on Defendant's person at one point

---

11. While "zoom" is not defined in the record, we assume that it refers to the camera's ability "to change the magnification of an image while maintaining the subject in focus." *The Random House College Dictionary* 1533 (rev. ed.1984).

and in two other instances focused on his hands; first, while he was shifting items from one hand to the other, and later when his purported customer passed something to him. Even with the assistance of the zoom lens, however, it is difficult to identify the material in Defendant's hands and the nature of the item passed to him. At the hearing on the suppression motion, defense counsel argued that the camera "constituted a violation . . . not of [sic] only the secret placement, but because of its capability." The court, however, concluded that Defendant had not challenged the super-human capabilities of the video camera, but merely objected to the camera's presence:

> Defendant does not dispute that an officer could have viewed exactly what was viewed through the video camera and recorded on the videotape. Defendant does not dispute that such a viewing through a human eye would be constitutional in the sense that no "search" would have oc-

curred. Rather, Defendant asserts that the ability to view and record in the *absence* of actual police presence violates the privacy clause of the state's constitution.

Conclusion No. 15 (some emphasis in original and some added). While Defendant seemingly contended that the camera had capabilities that a police officer could never have, he does not challenge conclusion No. 15.

The court made no finding with respect to the camera's zoom capability and its use in this case. The lack of such a finding is not challenged. Aside from what we have noted, nothing in the record establishes the exact role the camera's zoom feature had in Defendant's arrest.[12] Therefore, we are reluctant to determine this issue on so tenuous a record.[13] We conclude that Defendant has not demonstrated that the video surveillance was highly intrusive. On this record, we hold that the surveillance in this case did not constitute an unconstitutional intrusion.[14]

---

12. Of course, Kim contended the videotaped events played no part in his decision to arrest Defendant and the court did not discredit his version in any finding.

13. The zoom capability and other features of the video camera are analogous to "optical aids" discussed in *State v. Ward*, 62 Haw. 509, 516, 617 P.2d 568, 572 (1980). There, the police used "a set of 10x30 magnification binoculars" to "observe[ ] the activities in [a] seventh-floor apartment[.]" *Id.* at 511, 617 P.2d at 569. The supreme court laid out the following test:

> (1) the use of optical aids in the nature of binoculars, telescopes and the like is not itself determinative of the admissibility in evidence of the product of the observation; (2) the primary determinative fact is the presence or absence of a reasonable expectation of privacy of the person whose conduct, property, or documents is observed; (3) reasonable expectation of privacy in the context here involved is tested by the extent to which the person had exposed his conduct, property, or documents to public view by the naked eye; (4) *if the purpose of the optically aided view is to permit clandestine police surveillance of that which could be seen from a more obvious vantage point without the optical aid, there is no unconstitutional intrusion;* and (5) *if the purpose of the optical aid is to view that which could not be seen without it, there is.*

*Id.* at 515–16, 617 P.2d at 572 (emphases added). It warned that "if the purpose of the telescopic aid is to view that which could not be seen without it, it is a constitutional invasion." *Id.* at 517, 617 P.2d at 573.

That same year, the supreme court decided *State v. Knight*, 63 Haw. 90, 621 P.2d 370 (1980)

where the police used "7x50 high-powered binoculars" to conduct surveillance of a greenhouse whose sides were "wrapped with 80% shade cloth of black fiber glass material." *Id.* at 91, 621 P.2d at 372. The supreme court "consider[ed its] ruling of *Ward* applicable to the instant case," *id.* at 93, 621 P.2d at 373, and concluded that "[t]he use of the binoculars to view the contents of the greenhouse which were not visible to the naked eye violate[d] *Ward*." *Id.*

In *State v. Holbron*, 65 Haw. 152, 648 P.2d 194 (1982), a police officer, from a "vantage point on a hill approximately 300 meters away" saw what he believed to be marijuana plants in a fenced-in yard. The officer "thereafter used binoculars for a magnified view." *Id.* at 153, 648 P.2d at 196. The supreme court acknowledged that in *Ward* it "held that where the police use binoculars as an optical aid to view that which could not be seen without them, the observation constituted an unconstitutional search." *Id.* at 155, 648 P.2d at 196–97 (citing *Knight*, 63 Haw. at 93, 621 P.2d at 373; *Ward*, 62 Haw. at 517, 617 P.2d at 573). However, in *Holbron*, the supreme court held that "where binoculars are used only to confirm unaided observations into an area where appellant has no reasonable expectation of privacy, the surveillance does not constitute an unlawful search." *Id.* (citations omitted).

14. There may be circumstances under which video camera surveillance, even in a public place, may constitute an unconstitutional intrusion violative of our state constitution's guarantee against unreasonable searches, seizures, and invasions of privacy. We do not believe that the facts of this case present us with such circumstances.

## VII.

### A.

The State also contends that the court erred because the videotaping did not violate the United States or Hawai'i Constitutions, or any statute or administrative rule. On appeal, the American Civil Liberties Union (ACLU) also submitted an amicus curiae brief, in which it argues that the court also had inherent supervisory power under HRS § 603–21.9(6) (1993) to suppress evidence.

We have no quarrel with the premise that the courts possess inherent supervisory power over the cases before them. HRS § 603–21.9(6), entitled "Powers," legislatively confirms the inherent power of the circuit courts and provides:

The several circuit courts shall have the power:

. . .

(6) To make and award such judgments, decrees, orders, and mandates, issue such exceptions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to them by law or for the promotion of justice in matters pending before them.

### B.

■ In *Pattioay*, the supreme court pointed out that the State's violation of the constitutions, a statute, or an administrative rule may serve as the basis for suppressing evidence:

In addition to the violation by the State of a defendant's constitutional rights, . . . [a] "violation of a statute, or . . . violation of an administrative rule adopted pursuant to HRS chapter 91 . . . [,] since such rules have the force and effect of law[,]" can serve as the illegal act justifying suppression of otherwise admissible evidence.

*State v. Pattioay*, 78 Hawai'i at 468 n. 28, 896 P.2d at 924 n. 28 (quoting *State v. Kim*, 70 Haw. 206, 208, 767 P.2d at 1238, 1240 (1989) (citations omitted)). The supreme court also noted that our "courts have inherent supervi-

sory power" to preclude the use of illegally obtained evidence in criminal trials.

The purpose of the exclusionary rule, as we see it, is primarily to deter illegal police conduct and secondarily to recognize that the courts of this State have the inherent supervisory power over criminal prosecutions to ensure that evidence illegally obtained by government officials or their agents is not utilized in the administration of criminal justice through the courts. *State v. Santiago*, 53 Haw. 254, 264, 492 P.2d 657, 663 (1971) (citing *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), which states that "[t]he objective of deterring improper police conduct is only part of the larger objective of safeguarding the integrity of our adversary system"); HRS § 604–2 (1985). *See also State v. Kim*, 70 Haw. 206, 767 P.2d 1238 (1989) . . . .

*Id.* at 468, 896 P.2d at 924 (some citations and footnotes omitted). As stated in its conclusion No. 25, the court granted Defendant's suppression motion on the basis of this "inherent supervisory power."

While the supreme court acknowledged that "inherent supervisory power" was justifiably exercised in *Pattioay*, it cautioned against its use in all but "exceptional circumstances":

Without the prerogative to call upon powers such as these, our courts would be disabled from performing their essential function of adjudicating cases in a fair manner and from protecting their integrity and independence. However, the courts' inherent powers "must be exercised with restraint and discretion" and only in exceptional circumstances. *Kukui Nuts [of Hawaii v. R. Baird & Co.]*, 6 Haw.App. [431,] 438, 726 P.2d [268,] 272 [(1986)]. More importantly, invocation of a court's inherent power is legitimate only when reasonably necessary to effectuate its "judicial power," Haw. Const. art VI, § 1, that is, when reasonably necessary to carry out and protect the court's constitutional authority. *Ramil v. Keller*, 68 Haw. 608, 619, 726 P.2d 254, 262 (1986) (citing HRS § 603–21.9(6) (1985), which is merely a leg-

islative restatement and not the source of the circuit courts' inherent powers). . . .

*Id.* at 469, 896 P.2d at 925.

## C.

■ We believe the present case does not present such "exceptional circumstances," and therefore we hold that the court erred in suppressing the relevant evidence under its "inherent supervisory powers."

First, we have determined there was no constitutional violation because Defendant did not have an objectively reasonable expectation of privacy. The court also determined in its conclusions Nos. 4 and 18 that Defendant's expectation of privacy in a public street was not "one which society would recognize as objectively reasonable" and that "no constitutional violations have been established."

The court also did not rely upon a violation of a statute (federal or state) or an administrative rule to support its decision. The parties do not argue that any rights under a federal or state statute or administrative rule have been invoked and infringed upon in this case. As the court noted in its conclusion No. 20, there was no "legislation" or "executive agency rules and regulations over the specific procedures of the technology's use."

However, we conclude the court was not justified in precluding the evidence for trial under its inherent powers. As we have said, the police did not act illegally in arresting Defendant and in seizing the drugs. Since there was no illegal conduct by the officers demonstrated on the record, there was no threat of unfair process that would require suppression of the evidence and Defendant's statements.

## D.

Moreover, we conclude that the court was not authorized to exercise its inherent supervisory powers in the manner it did. By its conclusions Nos. 20, 21, 23, and 25, the court "require[d] legislation" to be enacted by the City Council or the State Legislature authorizing the use of video surveillance technology and "require[d]" further, standards and guidelines to be promulgated, all as conditions of admitting video surveillance evidence.

These conclusions present a dilemma. By their terms, they mandate legislative bodies to adopt certain laws before the court will consider videotapes admissible evidence in criminal proceedings. The judiciary does not possess the power to mandate legislation.

The supreme court has stated that the "separation of powers" doctrine is intended " 'to preclude a commingling of . . . essentially different powers of government in the same hands' and thereby prevent a situation where one department would be 'controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments.' " *Pray v. Judicial Selection Comm'n of the State,* 75 Haw. 333, 353, 861 P.2d 723, 732 (1993) (quoting *Trustees of Office of Hawaiian Affairs v. Yamasaki,* 69 Haw. 154, 168, 737 P.2d 446, 454, *cert. denied,* 484 U.S. 898, 108 S.Ct. 234, 98 L.Ed.2d 192 (U.S.Haw.1987) (internal quotation marks and citation omitted)).

■ In the instant case, the court's conclusions directly seek to "coercive[ly] influence" legislative bodies into enacting video surveillance legislation. However beneficial such laws are thought to be, the court's directive violates the separation of powers doctrine under our system of government. The courts have no inherent supervisory power over legislative bodies; the judiciary, however, has such power over "criminal prosecutions" before it and insofar as it exercises that power over "the litigation process" such power is exercised within its intended scope. While the court may, under appropriate circumstances, dismiss a prosecution or suppress evidence to protect the court's independence, integrity, and to ensure a fair litigation process, it does so in performing its function of "adjudicating cases." However, a court strays far from that function when it directs legislative bodies to adopt specific laws. Such action is not "reasonably necessary to effectuate its judicial power." *Pattioay,* 78 Hawai'i at 469, 896 P.2d at 925.

If as an *indirect* consequence of the court's exercise of its inherent supervisory power over litigation, salutary laws are adopted,

that course must be one freely chosen by the legislative bodies, not one seemingly coerced by the courts. As the integrity and independence of the judiciary must be respected, so must that of the other co-equal branches of government.

## VIII.

As an apparent reason for its action, the court expressed frustration about the management of trials in which videotapes may have been involved. The court took judicial notice in its conclusion No. 23 of *State v. Burgo,* Cr. No. 97–0528, where it noted that "the deputy prosecutor" and "testifying police officer represented to this court that video tapes were not available to the Chinatown sub-station for use with the video cameras." The court noted, however, that "as reflected by this record, [video]tapes were available."

As we have held, the court's mandate that legislation be passed was in error. But we do not foreclose the possibility that the court could have exercised its inherent supervisory power to fashion appropriate measures in *Burgo* or in cases similarly situated where it found misconduct. Furthermore, if the court believed as it implies, that misrepresentation as to the non-existence of video surveillance tapes took place, it could have resorted to power expressly given it to sanction discovery abuses.

**15.** Hawai'i Rules of Penal Procedure (HRPP) Rule 16(e)(9)(ii) provides that "[w]ilful violation by counsel of an applicable discovery rule or an order issued pursuant thereto may subject counsel to appropriate sanctions by the court."

HRPP Rule 16 does not expressly provide for the dismissal of a case as a sanction for failing to abide by discovery obligations. However, case law interpreting HRPP Rule 16 acknowledges that a court may, in exercising its discretion, order dismissal of a case. The court's broad sanctioning power is found in HRPP Rule 16(e)(9)(ii), which states in pertinent part as follows:

If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or an order issued pursuant thereto, *the court . . . may enter such other order as it deems just under the circumstances.*

(Emphases added.)

In *State v. Dowsett,* 10 Haw.App. 491, 878 P.2d 739, cert. denied, 77 Hawai'i 373, 884 P.2d 1149 (1994), this court stated that "it cannot be controverted that 'the trial court is . . . empowered

In *State v. Dowsett,* 10 Haw.App. 491, 878 P.2d 739, *cert. denied,* 77 Hawai'i 373, 884 P.2d 1149 (1994), we held that sanctions pursuant to HRPP Rule 16,[15] as well as contempt and referral for professional disciplinary actions, are available as sanctions for violations of discovery rules and orders. *Id.* at 498–99, 878 P.2d at 743–44. In *Dowsett,* the "court ordered the State to provide [the defendant] with any statements made by the complaining witness." *Id.* at 493, 878 P.2d at 741. Approximately two weeks before trial, a document containing the complaining witness's "description of the suspect and vehicle" emerged, which the prosecutor admitted that he knew of, but "forgot about." *Id.* at 494, 878 P.2d at 741. We said that "[f]ailure to disclose the document [im]properly resulted in an unnecessary interruption of the trial affecting the jury, the court, the [d]efendant, the witnesses, and other pending criminal cases." *Id.* at 497, 878 P.2d at 743. Such discoverable information may "tend[ ] to negate the guilt of the accused [or] mitigate[ ] the degree of the offense[, and therefore] . . . the prosecutor was . . . ethically bound to 'make timely disclosure.'" *Id.* (citing Hawai'i Rules of Professional Responsibility DR 7–103(B) (1991)). We reiterated that

[t]he obligation to seek justice is paramount and the prosecution's duty under

to dismiss under HRPP Rule 16(e)[ (9)(i) ] for non-compliance [with] Rule 16.'" *Id.* at 495, 878 P.2d at 742 (quoting *State v. Marzo,* 64 Haw. 395, 397, 641 P.2d 1338, 1340 (1982) (footnote omitted)) (brackets in original). However, this court further held that "before a court . . . order[s] dismissal of a case because of the State's violation of HRPP Rule 16, it must consider whether less severe measures would rectify prejudice caused to the defendant by the violation." *Id.* Conceivably the court's broad power would include suppression of evidence.

In exercising its broad discretion the trial court should also consider "the reasons why the disclosure was not made, the extent of prejudice, if any, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." *Id.* (internal quotation marks and citation omitted); *see State v. Kaiu,* 5 Haw.App. 350, 354–55, 692 P.2d 1166, 1169–70 (1984) (holding that when the prosecution is alleged to have violated its duty to disclose, the trial court should determine whether defendant has proven that violation was maliciously or egregiously committed or done in bad faith; if mistrial or dismissal is not granted, trial court should choose less severe measures which would cure prejudice.)

HRPP Rule 16 must be diligently observed. Discovery is at the foundation of the fact finding and truth seeking process. Faithful adherence to discovery obligations serves the public interest: Discovery provides the basic information which is necessary to expedite trials and plea decisions in an already overburdened court system and promotes fairness in the adversary system. *Id.* at 497–98, 878 P.2d at 743.

■ On remand, if the court finds that the prosecution or the police witness misrepresented to the court knowledge of the existence of a videotape and its availability in the *Burgo* case or in any other case, the court is authorized under *Dowsett* to impose sanctions under HRPP Rule 16(e)(9)(ii) or to bring contempt charges, or additionally, in the case of the prosecutor, to refer the matter to the disciplinary counsel, or impose all or any combination of the foregoing measures.

### IX.

For the reasons stated, we vacate that part of the court's February 17, 1998 order granting in part Defendant's motion to suppress. We instruct the court to enter an order denying that part of Defendant's suppression motion. We remand the case for trial and for any appropriate sanctions the court may believe should be imposed in light of our decision.