975 P.2d 773

STATE of Hawai'i, Plaintiff–Appellee,

v.

John BALBERDI, Defendant–Appellant.

No. 21414.

Intermediate Court of Appeals of Hawai'i.

Jan. 22, 1999.

Tom Griswold, on the brief, for defendant-appellant.

Simone C. Polak, Deputy Prosecuting Attorney, County of Maui, on the brief, for plaintiff-appellee.

BURNS, C.J., WATANABE, and KIRIMITSU, JJ.

Opinion of the Court by KIRIMITSU, J.

Defendant–Appellant John Balberdi (Defendant) appeals from the Second Circuit Court's February 19, 1998 judgment, guilty conviction, and sentence for Promoting a Dangerous Drug in the First Degree pursuant to Hawai'i Revised Statutes (HRS) § 712–1241(1)(a)(i) (1993) and Prohibited Acts Related to Drug Paraphernalia pursuant to HRS § 329–43.5(a) (1993),[1] and its December 5, 1997 Findings of Fact and Conclusions of Law. Defendant is currently incarcerated at the Halawa Medium Security Facility.

On appeal, Defendant contends that the search warrant (which led to the evidence used against him) was executed in violation of HRS § 803–37 (1993),[2] and, therefore, the

---

1. Hawai'i Revised Statutes (HRS) § 712–1241(1)(a)(i) (1993) provides:

Promoting a dangerous drug in the first degree. (1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:
(a) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
(i) One ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]

HRS § 329–43.5(a) (1993) provides:
Prohibited acts related to drug paraphernalia. (a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. . . .

2. HRS § 803–37 (1993) reads:

Power of officer serving. The officer charged with the warrant, if a house, store, or other building is designated as the place to be searched, may enter it without demanding permission if the officer finds it open. If the doors are shut the officer must declare the officer's office and the officer's business, and demand entrance. If the doors, gates, or other bars to the entrance are not immediately opened, the officer may break them. When entered, the officer may demand that any other part of the house, or any closet, or other closed place in which the officer has reason to believe the property is concealed, may be opened for

trial court erred in denying his motion to suppress evidence. We disagree.

## I. *BACKGROUND*

On March 4, 1997, at approximately 11:15 a.m., Maui Police Department (MPD) officers executed a narcotics search warrant at 471 Lipo Place, Wailuku, Maui (the residence). The officers entered the residence through the front door and began their search. Defendant was asleep in his bedroom with the door closed at the time the police officers entered the residence. Officer Michael Bates (Officer Bates) entered Defendant's bedroom and recovered "three packets containing approximately ninety-two grams of Crystal methamphetamine."

On July 28, 1997, Defendant was indicted and charged with one count of Promoting a Dangerous Drug and one count of Prohibited Acts Related to Drug Paraphernalia.

On October 22, 1997, Defendant filed a Motion to Suppress Evidence, challenging the manner in which the search warrant had been executed.

At the November 20, 1998 evidentiary hearing on this motion, Defendant's witnesses testified that the police officers had failed to "knock and announce" as required by HRS § 803–37. Defendant's cousin, Virginio Lista (Lista), testified that on the morning of March 4, 1997, he was outside the residence and was approached and frisked by police officers. Lista testified that the police officers then brought him a chair and made him sit down in the driveway of the residence. According to Lista, the officers approached the door of the residence, and one officer put his ear to the door, turned the knob, and opened the door. Lista testified that he did not hear the police yell, "police, we have a search warrant, we demand entry."

Another of Defendant's cousins, Dane Urpanil (Urpanil), who lives at the residence, testified that he was in the bathroom brushing his teeth when the police officers entered through the partially opened bathroom door and handcuffed him. Urpanil testified that he "couldn't hear" the police officer knock on the officer's inspection, and if refused the offi-

the outside door to the house. Urpanil also testified that the officer said nothing before entering Defendant's bedroom. Urpanil acknowledged that he works with Lista at an auto body shop owned by Lista's father and admitted that the police recovered marijuana and crystal methamphetamine from his bedroom.

Defendant's elderly grandparents, Trinidad Balberdi (Trinidad) and Francisco Balberdi (Francisco), testified that they were in the living room of the residence when the police officers arrived. Trinidad testified that the police did not say anything before entering the house or before opening the door to Defendant's bedroom. Francisco similarly testified that he did not hear a knock on the front door before the police officers entered the residence. A large amount of cash and gambling devices relating to cockfighting were recovered from Francisco's bedroom.

Officer Anthony Poplardo (Officer Poplardo) executed the search warrant at the residence and testified that upon reaching the front door, he "knocked and announced" three times. According to his testimony, Poplardo stated, "Police," banged the door, then said "Search Warrant, we demand entry," banged the door again, and repeated this two additional times. A courtroom timing of this process indicated that it took approximately twenty seconds.

Officer Poplardo stated that he heard no reply from within the residence during his knock and announce and that he waited a few more seconds before turning the door knob, finding it unlocked, and opening the door slightly. Officer Poplardo waited "a second or two" and then pushed the door completely open and entered. Officer Poplardo testified that it took approximately thirty to forty seconds from the time he approached the door to the time that he entered the residence.

Officer Poplardo stated that this was only the "third or fourth" search warrant that he had executed but that he had learned the standard procedure from other officers: cer may break them.

"[W]e know the ruling that needs to be about 30 seconds, so we developed knock three times with the waiting period, and we do it the same, everybody's warrant is the same every time we assist. It's not a written rule but we know it works."

In his signed police report, however, Officer Poplardo had written that he had knocked and announced twice. When asked about the police report, Officer Poplardo testified that he believed that he knocked and announced three times "cuz I have the routine for do it three times," and that perhaps the report contained a typographical error.

Officer Edwin Arreola (Officer Arreola), also present at the execution of the search warrant, testified that during Officer Poplardo's approach, he was midway between the left and right back area of the residence and heard Officer Poplardo conduct the knock and announce "more than once."

The court also considered, by filed stipulation, an affidavit from Officer Bates. Officer Bates assisted Officer Poplardo in the execution of the search warrant at the residence and stated that he observed Officer Poplardo "bang on the front door of [the residence] and loudly state, 'Police. Search Warrant. We demand entry,' several times."

Officer Bates also stated that he (Officer Bates) entered Defendant's bedroom and, prior to entry, banged on the door to the room and shouted, " 'Police. Search Warrant,' and then waited for a couple of seconds, banged on said door again," and then "either opened it or kicked it open[.]"

On December 5, 1997, the court made the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. On March 4, 1997, at approximately 11:15 a.m., Search Warrant SW 97–40 was executed on the residence occupied by Frederick Balberdi at 471 Lipo Place, Wailuku, Maui, Hawaii [Hawai'i], for an unascertainable amount of Crystal methamphetamine, an unascertainable amount of U.S. Currency, articles of identification and documents and paraphernalia relating to said Crystal Methamphetamine.

2. No evidence was offered that the Search Warrant was limited to only a certain portion of the residence.

3. No evidence was introduced to show that the police had any information that other than family members resided at said residence or that separate residential units were located within.

4. Said Search Warrant was executed by Officer Anthony Poplardo of the [MPD], who on three occasions pounded on the main door, and said loudly "Police. Search Warrant. We demand entry."

5. Said knock and announce was heard by Officer Edwin Arreola of the MPD, who had stationed himself on the opposite side of said residence where Defendant's bedroom happened to be.

6. Officer Poplardo's in court demonstration of his knock and announce made it clear that everyone in the house should have heard him.

7. Said knock and announce took at least twenty seconds to accomplish, after which time Officer Poplardo turned the door knob, found said knob to be unlocked and opened said door and entered said premises.

8. Defense witnesses Trinidad and Francisco Balberdi were seated directly on the other side of the door within twelve feet of it.

9. Parties stipulated to the testimony of Officer Bates.

10. Officer Michael Bates followed Officer Poplardo into the living room of said residence, then turned to the first door to his right in the hallway leading from said living room.

11. Officer Michael Bates then banged on the door to said room and shouted "Police, Search Warrant," and waited for a couple of seconds, banged on said door again, and then either opened said door or kicked it open.

12. The occupant of said room was Defendant John Balberdi.

13. Said room was searched and three packets containing approximately ninety-two grams of purported Crystal Methamphetamine were recovered therefrom.

14. The testimony of the defense witnesses was in stark contrast to that of the police witnesses. The defense witnesses' testimony appears to have been affected by personal interest, relation, bias and improbability.

15. All defense witnesses were closely related as cousins, grandparents, etc.

16. Some worked with each other.

17. They were apparently heavily involved in cockfighting which is an illegal activity.

18. Defendant is charged with a Class A felony offense.

19. Defendant's witnesses were less credible than the State's witnesses.

## CONCLUSIONS OF LAW

1. That Search Warrant SW 97–40 authorized the police to search the entire residence at 471 Lipo Place, Wailuku, Maui, Hawaii [Hawai'i]. *State v. Anderson,* 84 Hawaii [Hawai'i] 462, 935 P.2d 1007 (1997).

2. That before entering the residence at 471 Lipo Place, Wailuku, Maui, Officer Poplardo performed his knock and announce properly by knocking and then stating his office, purpose, and demanding entry, three times over a period of at least twenty seconds. *State v. Garcia,* 77 Hawaii [Hawai'i] 461, 887 P.2d 671 ([App.] 1995).

3. That police were authorized to enter all areas of the residence upon proper initial entry and compliance with knock and announce procedures at the front door. *State v. Anderson,* 84 Hawaii [Hawai'i] 462, 935 P.2d 1007 (1997).

4. That police afforded Defendant extra protection by knocking and announcing their office and purpose before entering the bedroom.

5. That Defendant's bedroom in his parent's home did not elevate to the status of a separate residential unit just because his door was closed or even locked. *State v. Anderson,* 84 Hawaii [Hawai'i] 462, 935 P.2d 1007 (1997).

6. That upon entry at the front door, Defendant received notice of the police presence and purpose and further permission to search his room as included in the Search Warrant authority to search the residence was not required. *People v. Howard,* [18 Cal.App.4th 1544,] 23 Cal. Rptr.2d 212 (Cal.App. 3 Dist.1993).

7. [HRS § ] 803–37 does not require police to make a demand on inner doors rather leaving [it] to their discretion.

The court consequently ordered:

## ORDER

Based upon the foregoing Findings of Fact and Conclusions of Law, the Court hereby denies the Motion to Suppress Evidence and orders all evidence found and seized from the bedroom of Defendant John Balberdi, including the three packets of purported Crystal Methamphetamine, shall be admitted.

On December 9, 1997, Defendant pled no contest to the indictment as charged. On February 19, 1998, Defendant was convicted as charged and sentenced to concurrent prison terms of twenty years on the first count, and five years on the second count.

Defendant filed a timely Notice of Appeal on March 10, 1998.

## II. DISCUSSION

Defendant argues that the trial court erred in: (1) finding that the police officers properly "knocked and announced" their presence as required by HRS § 803–37 prior to opening the front door of the residence; and (2) concluding that HRS § 803–37 "does not require police to make a demand on inner doors rather leaving [it] to their discretion." We address each argument in turn.

### A. Standard of Review

We review a circuit court's findings of fact in a pretrial ruling according to the following standard:

Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to

support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is left with a definite and firm conviction that a mistake has been made. The circuit court's conclusions of law are reviewed under the right/wrong standard. Furthermore, in a case such as the one at bar, the proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his own Fourth Amendment rights were violated by the search and seizure sought to be challenged. The proponent of the motion to suppress must satisfy this burden of proof by a preponderance of the evidence.

*State v. Anderson,* 84 Hawai‘i 462, 466–67, 935 P.2d 1007, 1011–12 (1997) (citations, internal quotation marks, brackets, emphasis, and internal block quote format omitted).

## B. *Knock and Announce Satisfactorily Performed*

### 1. *Outer Door*

Defendant first argues that the trial court erred in finding that the police officers satisfied the "knock and announce" requirements of HRS § 803–37 prior to entering the front door of the residence. Specifically, Defendant contends that "the trial court was clearly erroneous in accepting the story of [Officer] Poplardo" over that of defense witnesses who "were consistent, clear and positive in their assertions."

▪ HRS § 803–37 requires that, when executing a search warrant, a police officer must knock, identify himself as a police officer, state his purpose, demand entry, and allow a reasonable time for the occupants within to answer the door, unless there are exigent circumstances. *See State v. Garcia,* 77 Hawai‘i 461, 887 P.2d 671 (App.1995). In the instant case, three police officers averred that the *Garcia* standards had been met in the execution of the warrant. Officer Poplardo stated that he banged loudly at the door and shouted, "Police. Search Warrant. We demand entry." He repeated this two additional times. Officer Arreola confirmed that Officer Poplardo had performed the "knock and announce." Officer Bates similarly stated that Officer Poplardo had satisfactorily performed the "knock and announce." Defendant's witnesses, on the other hand, testified that no knock and announce was performed.

▪ "It is for the trial judge as fact-finder to assess the credibility of witnesses and to resolve all questions of fact; the judge may accept or reject any witness's testimony in whole or in part." *State v. Eastman,* 81 Hawai‘i 131, 139, 913 P.2d 57, 65 (1996) (citation omitted). Further, "[a]n appellate court will not pass upon the trial judge's decisions with respect to the credibility of witnesses and the weight of the evidence, because this is the province of the trial judge." *Id.* (citations omitted).

We conclude that the record supports the trial court's finding that the testimony of Defendant's witnesses "appears to have been affected by personal interest, relation, bias, and improbability." All of Defendant's witnesses were members of Defendant's family, several were found in the possession of drugs or drug paraphernalia, and all seemed to share some involvement in cockfighting and illegal gambling.

Consequently, we conclude that the trial judge's finding that "Defendant's witnesses were less credible than the State's witnesses" is supported by the record and that his decision to credit the State's witnesses was not "clearly erroneous."

### 2. *Inner Door*

▪ Defendant next argues that the trial court erred as a matter of law in concluding that "[HRS § ] 803–37 does not require police to make a demand on inner doors rather leaving [it] to their discretion." We disagree. Employing methods of statutory construction, we conclude that the legislature intended that the "knock and announce" at inner doors be discretionary.

HRS § 803–37 provides:

The officer charged with the warrant, if a house, store, or other building is designated as the place to be searched, may enter it without demanding permission if the officer finds it open. If the doors are shut[,]

the officer must declare the officer's office and the officer's business, and demand entrance. If the doors, gates, or other bars to the entrance are not immediately opened, the officer may break them. *When entered, the officer may demand that any other part of the house, or any closet, or other closed place in which the officer has reason to believe the property is concealed, may be opened for the officer's inspection, and if refused the officer may break them.*

(Emphasis added.)

■ " 'The starting point in statutory construction is to determine the legislative intent from the language of the statute itself.' " *State v. Dixon*, 83 Hawai'i 13, 17, 924 P.2d 181, 184 (1996) (quoting *State v. Garcia*, 77 Hawai'i at 465, 887 P.2d at 675). "[The] court's primary duty is to ascertain and implement the intention of the legislature. In ascertaining intent, the language of the provision must be read in the context of the entire statute and construed in a manner consistent with its purposes." *State v. Kumukau*, 71 Haw. 218, 223–24, 787 P.2d 682, 686 (1990) (citations and internal quotation marks omitted). "[W]here the language of the statute is plain and unambiguous, construction by the court is inappropriate, and the court is bound to give effect to the law, according to its plain and obvious meaning." *State v. Tavares*, 63 Haw. 509, 511, 630 P.2d 633, 635 (1981) (citation omitted). "The words of a law are generally to be understood in their most known and usual signification. . . ." HRS § 1–14 (1993).

HRS § 803–37 states that once inside a building, police officers "may" demand that a "closed place" be opened, and, if refused, the officer "may" break it open. In contrast, the initial portion of the statute provides that if the officer encounters a closed door upon *initial* entry, the officer "must" declare his office and his business and demand entrance. According to the Hawai'i Supreme Court:

In the past, this court has subscribed to the proposition that, where the verbs "shall" and "may" are used in the same statute, especially where they are used in close juxtaposition, we infer that the legislature realized the difference in meaning and intended that the verbs used should carry with them their ordinary meanings. Not surprisingly, we have therefore construed the close proximity of the contrasting verbs "may" and "shall" to require a *mandatory* effect for the term "shall." Thus, the converse would seem to follow, namely, that the close proximity of the contrasting verbs "may" and "shall" requires a *non-mandatory*, i.e., a discretionary, construction of the term "may."

*State v. Cornelio*, 84 Hawai'i 476, 493, 935 P.2d 1021, 1038 (1997) (emphasis in original and ellipses, citation, and internal block quote format omitted); *see also State v. Brantley*, 84 Hawai'i 112, 123, 929 P.2d 1362, 1373 (App.1996) ("[W]hen a statute contains both mandatory and directory verbs such as 'shall' and 'may' in close juxtaposition, the court is to infer that the legislature intended that the verbs should carry with them their ordinary meanings").

Defendant argues that the State's (and the trial court's) interpretation of HRS § 803–37 "would result in the provision in question becoming inoperative and insignificant." Defendant bases his analysis on *Garcia's* holding that police officers must specifically demand entry and wait a reasonable time to allow an occupant to open a door before entering. *Garcia*, 77 Hawai'i at 466, 468, 887 P.2d at 676, 678. In *Garcia*, the court found that a ten-second delay between announcing "Police, Open up!" and breaking down the front door was unreasonable. *Id.* at 469, 887 P.2d at 679. However, *Garcia* dealt with the *initial* entry at the *outer* door of a residence.

Defendant asserts, "[l]ike the language construed in *Garcia*, . . . the requirement that police demand that the locked door be opened is unambiguously clear." However, as discussed above, the statutory language dealing with inner doors is *not* like the language construed in *Garcia*. The legislature chose the word "may" to reflect a non-mandatory requirement. The omission of the word "must" in the latter half of the statute does not mandate a conclusion similar to *Garcia*.

■ The more important holding of *Garcia* applicable to the instant case is that the

legality of searches and seizures is governed by a "reasonableness" standard. *Id.* at 467, 887 P.2d at 677. According to *Garcia*, "[t]he purpose of the knock-and-announce rule is to notify the person inside of the presence of the police and of the impending intrusion, give that person time to respond, avoid violence, and protect privacy as much as possible." *Id.* at 468, 887 P.2d at 678 (citations, quotation marks, brackets, and footnote omitted). In the instant case, we conclude that it was reasonable for the police to assume that notice had been given to the occupants by their initial "knock and announce" and that repeating a "knock and announce" at all interior doors would not serve the above enunciated purposes.

In *People v. Howard*, a California court was confronted with a case similar to the instant one.[3] *People v. Howard*, 18 Cal. App.4th 1544, 23 Cal.Rptr.2d 212 (Cal.Ct. App.1993). In *Howard*, police officers executed a search warrant by "knocking and announcing" at the outer door to the residence. Once inside, the officers entered a closed bedroom after knocking, stating, "Police, search warrant" and simultaneously opening the door and entering. *Id.*, 23 Cal. Rptr.2d at 214. The defendant claimed that evidence seized from the bedroom should be suppressed because the officers had entered without giving him an opportunity to respond to their announcement. *Id.*

The *Howard* court held that compliance with the "knock and announce" at the *outer* door before entering was sufficient, and once inside, officers were not required to comply again before entering a closed inner room. *Id.*, 23 Cal.Rptr.2d at 213. According to the court, its holding served the purpose underlying § 1531, namely "the protection of the police and other innocent people by preventing violent confrontations likely to be caused by precipitous police entry." *Id.*, 23 Cal. Rptr.2d at 216. The court explained:

[A] rule which requires officers who have complied with knock-notice at an outer door to repeat those procedures at each inner door does not protect any cognizable privacy right of the occupants. At the point of entry, knock-notice clearly protects the homeowner from the outrage of having "his castle suddenly and violently broken into."

*Id.* (citations omitted).

Similarly, in the instant case, we conclude that compliance with the "knock and announce" at the *outer* door before entering was sufficient, and once inside, officers were not required to comply again before entering Defendant's closed bedroom. Requiring police officers to "knock and announce" at every closed inner door would not further the purpose underlying HRS § 803–37 as enunciated by the *Garcia* court, namely, "notify[ing] the person inside of the presence of the police and of the impending intrusion, giv[ing] that person time to respond, avoid[ing] violence, and protect[ing] privacy as much as possible." *Id.* at 468, 887 P.2d at 678 (citations, quotation marks, brackets, and footnote omitted). We conclude that this purpose was satisfied by the police officers' initial "knock and announce" at the outer door of the residence. According to the record, Defendant either was, or should have been, aware of the presence of the police officers and the impending intrusion by the officers' initial "knock and announce."

Further, the specific use of the word "may" in dealing with this issue stands in direct contrast to the "must" language at the beginning portion of the statute. Accordingly, we conclude that the plain language of HRS § 803–37 manifests a clear legislative intent that police officers have the discretion to "knock and announce" on inner doors once they have entered a building, and, therefore, the trial court was not wrong as a matter of law. Because we do not conclude that an additional "knock and announce" is required at inner doors, we need not address Defen-

---

**3.** The California "knock-and-announce" statute in question provided:

The officer may break open any outer or inner door or window of a house, or any part

of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance.

Cal.Penal Code § 1531.

dant's arguments that the "knock and announce" was insufficiently performed.

### III. *CONCLUSION*

For the reasons above, we affirm the trial court's December 5, 1997 Findings of Fact and Conclusions of Law and affirm its February 19, 1998 judgment, guilty conviction, and sentence.