40 P.3d 865

Joseph P. CASTRO,
Respondent/Petitioner–Appellee,

v.

ADMINISTRATIVE DIRECTOR OF The
COURTS, State of Hawai'i, Petition-
er/Respondent–Appellant.

No. 23232.

Supreme Court of Hawai'i.

Jan. 28, 2002.

Reconsideration Denied Feb. 19, 2002.

As Amended March 1, 2002.

■

Girard D. Lau, Deputy Attorney General, State of Hawai'i, for petitioner/respondent-appellant.

Roland Nip, Honolulu, for respondent/petitioner-appellee.

MOON, C.J., LEVINSON, and ACOBA, JJ.; with RAMIL, J., Concurring Separately; and Nakayama, J., Concurring Separately and Dissenting.

Opinion of the Court by ACOBA, J.

■ We hold that the meaning of "prior alcohol enforcement contact" must be explained when advising a person arrested for driving under the influence of intoxicating liquor (DUI), Hawai'i Revised Statutes (HRS) § 291–4 (Supp.1999), of the potential length of license revocation for refusal to take a blood alcohol concentration (BAC) test or for failing such a test, as set forth in HRS § 286–261 (Supp.1999), in order to ensure that the refusal of, or consent to, such a test is knowingly and intelligently made. The arresting officer in this case did not render such an explanation to Respondent/Petitioner Appellee Joseph P. Castro (Respondent). Accordingly, we conclude that Respondent's refusal to take the test was not knowingly and intelligently made and should have been precluded as evidence at the Administrative Driver's License Revocation Office (ADLRO) driver's license revocation hearing and subsequent appeal to the district court of the first circuit [1] (the court).

1. The Honorable Tenney Z. Tongg presided over Respondent's judicial appeal of the ADLRO's decision affirming license revocation.

2. Chief Judge James S. Burns authored the opinion for the ICA and was joined by Associate Judges Corinne K.A. Watanabe and John S.W. Lim.

3. HRS § 291–4 states in relevant part as follows:
 (a) A person commits the offense of driving under the influence of intoxicating liquor if:
 (1) The person operates or assumes actual physical control of the operation of any vehicle while under the influence of in-

While HRS § 286–258(d)(3) (Supp.2000) allows for revocation of a driver's license for refusal to take a BAC test, it provides for the same outcome in the event that the evidence proves by a preponderance that "the arrestee drove, operated, or was in actual physical control of the motor vehicle while under the influence of intoxicating liquor[.]" Such a finding in the November 29, 1999 decision of Petitioner/Respondent Appellant Administrative Director of the Courts, State of Hawai'i (the Director), following the ADLRO hearing, constitutes a basis, independent of Respondent's refusal, for sustaining revocation of his license. Accordingly, we reverse the May 7, 2001 decision of the Intermediate Court of Appeals [2] (the ICA) affirming the court's February 1, 2000 judgment that failed to account for that finding, see Castro v. Administrative Director of the Courts, State of Hawai'i, 98 Hawai'i 53, 41 P.3d 715 (Haw. Ct.App.2001), vacate the court's February 1, 2000 judgment, and remand this case to the court with instructions to enter an order affirming the Director's decision.

I.

On September 16, 1999, Respondent was arrested for DUI, HRS § 291–4.[3] At the time of the arrest, and pursuant to "Part XIV of HRS chapter 286, Administrative Revocation of Driver's License[,]" the arresting officer read Honolulu Police Department (HPD) Form 396B to Respondent, informing him that he could take a BAC blood or breath test, or both, but if he refused a test or if he took a test and failed, he was subject to certain sanctions. See HRS § 286–255

toxicating liquor, meaning that the person concerned is under the influence of intoxicating liquor in an amount sufficient to impair the person's normal mental faculties or ability to care for oneself and guard against casualty; or
 (2) The person operates or assumes actual physical control of the operation of any vehicle with .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood or .08 or more grams of alcohol per two hundred ten liters of breath.

(Supp.1999). In relevant part the form stated:

> Pursuant to the Administrative Driver's License Revocation Law, I must inform you (arrestee) of the following:
>
> . . . .
>
> B. That *if you refuse to take any tests,* the consequences are as follows:
>
> . . . .
>
> 3. If your driving record shows two prior *alcohol enforcement contacts* during the seven years preceding the date of arrest, your driving privileges will be revoked for four years instead of the two year revocation that would apply *if you chose to take a test and failed it*[.]
>
> 4. If your driving record shows three or more prior *alcohol enforcement contacts* during the ten years preceding the date of arrest, your driving privileges will be revoked for life *regardless of whether you take a test or not*[.][4]
>
> . . . .
>
> C. That criminal charges under Section 291-4 HRS, may be filed[.]

(Emphases added.)

The arresting officer thereafter issued Respondent a notice of administrative license revocation. *See id.* Upon review, the Director affirmed Respondent's revocation by way of a notice of administrative review decision. *See* HRS § 286-258(a). The notice revoked Respondent's driver's license for four years, pursuant to the advice stated in paragraph 3 of HPD Form 396B.

Respondent subsequently requested an administrative hearing before the ADLRO to challenge the revocation. *See* HRS § 286-258(b). On November 24, 1999, the hearing was convened before an ADLRO hearing officer. At the hearing, the arresting officer testified that Respondent refused to take any test and did not ask any questions. The arresting officer also related his belief that a "prior alcohol enforcement contact[ ]" means a prior arrest for DUI:

> Q [RESPONDENT'S COUNSEL]. What does the phrase, prior alcohol enforcement contact mean?
>
> A. It means, I believe, if you've been arrested for driving under the influence previously.

Respondent testified that he believed prior alcohol enforcement contacts meant prior DUI convictions and arrests. Because he had had two prior convictions and a prior arrest for DUI (for which he was subsequently acquitted), he concluded that he had had three prior alcohol enforcement contacts. Thus, under the advice rendered in paragraph 4 of HPD Form 396B, it was his belief that he was subject to a lifetime revocation whether he took a test or not. Respondent related he did not take a test based on that understanding. Contrary to the arresting officer's testimony and Respondent's belief, an alcohol enforcement contact as defined in HRS § 286-251 (Supp.1999) would not include an arrest.[5] *See also* discussion, *infra.* The hearing officer determined that, in fact, Respondent had been the subject of two, and not three, such contacts.

On November 29, 1999, the Director issued a notice of administrative hearing decision, along with findings of fact and conclusions of law, sustaining the four-year revocation. In

---

4. Paragraphs 1 and 2 stated:
 1. If your driving record shows no prior alcohol enforcement contacts during the five years preceding the date of arrest, your driving privileges will be revoked for one year instead of the three month revocation that would apply *if you chose to take a test and failed it*[.]
 2. If your driving record shows one prior alcohol enforcement contact during the five years preceding the date of arrest, your driving privileges will be revoked for two years instead of the one year revocation that would apply *if you chose to take a test and failed it*[.]

 (Emphases added.)

5. HRS § 286-251 (Supp.1999) defines "alcohol enforcement contact" as follows:

 "Alcohol enforcement contact" means any administrative revocation ordered pursuant to this part; any driver's license suspension or revocation imposed by this or any other state or federal jurisdiction for refusing to submit to a test for alcohol concentration in the person's blood; or any conviction in this or any other state or federal jurisdiction for driving, operating, or being in physical control of a motor vehicle while having an unlawful concentration of alcohol in the blood, or while under the influence of alcohol.

her November 29, 1999 findings of fact and conclusions of law, the hearing officer decided in pertinent part as follows:

## FINDINGS OF FACT

. . . .

1. On September 16, 1999, at about 12:50 a.m. in the County of Honolulu, [the] arresting officer ... observed [Respondent] operating a motor vehicle. . . .

2. The Arresting Officer observed the vehicle travelling west bound on the H–1 Freeway prior to the Kunia off-ramp. *The officer observed the vehicle travelled to the right shoulder with half the vehicle over the shoulder line and then veered to the left and entered the adjacent left lane. The officer saw this occurrence three more times.*

3. The Arresting Officer stopped [Respondent] on Kunia Road. [The o]fficer ... spoke to the driver and identified him as the [Respondent] via his driver's license. *[The o]fficer ... observed that [Respondent] fumbled with his wallet and vehicle documents. [The o]fficer ... also detected a strong odor of an alcoholic beverage on [Respondent]'s breath as he spoke, speech that was slurred, and eyes that were watery and glassy.*

. . . .

5. [Respondent] was arrested for driving under the influence.

6. The Arresting Officer informed [Respondent] of the choice of taking a blood or breath test or both tests, and of sanctions for refusing to take either of these tests. As [the o]fficer ... attempted to read Form HPD–396B to [Respondent], [Respondent] pushed the form away and stated that he refused to take any test. [The o]fficer ... read the whole form, and [Respondent] refused to take a blood or breath test.

7. *[Respondent] refused to take the blood or breath test.*

8. [Respondent]'s driving record for the five years preceding the date of arrest indicates two prior alcohol enforcement contacts as defined by [HRS § 286–251].

. . . .

## CONCLUSIONS OF LAW

. . . .

2. There existed probable cause, the manner of driving and physical signs of intoxication[ ], to believe that [Respondent] drove, operated, or was in actual physical control of the motor vehicle while under the influence of intoxicating liquor.

3. *[Respondent] refused to take a blood or breath test.*

4. *Notwithstanding the foregoing, there existed by a preponderance of the evidence that [Respondent] drove, operated, or was in actual physical control[ ] of the motor vehicle while under the influence of intoxicating liquor.*

(Emphases added.)

## II.

On December 10, 1999, Respondent filed a petition for judicial review of the decision and order. *See* HRS § 286–260 (1993 & Supp. 2000). In his brief in support of his petition, Respondent claimed that he "did not make a knowing and intelligent refusal [of the BAC test] and the revocation must be reversed," citing *State v. Wilson*, 92 Hawai'i 45, 987 P.2d 268 (1999), as authority. Agreeing with Respondent, the district court reversed the administrative license revocation.

In its decision, the court acknowledged that, "in this case[,] the Director not only found that [Respondent] refused to take a test for concentration of alcohol in the blood, but also[ ] found that [Respondent] drove, operated, or was in actual physical control of the motor vehicle while under the influence of alcohol." Nevertheless, the court went on to rule that "where a police officer has not clearly and accurately informed an arrestee of his [or her] implied right to consent or refuse, together with the consequences of each, and the arrestee does not take a test for concentration of alcohol in the blood," "the [a]rrestee has been substantially prejudiced." According to the court, "[t]aking the test ... could have provided the [a]rrestee with exculpatory evidence," for if the arrestee's blood "alcohol concentration was less than .08," the "administrative revocation pro-

ceedings would have been terminated with prejudice" "pursuant to [HRS § ] 286–256[.]" [6]

In his opening brief on appeal to the ICA, the Director first contended that, as a matter of fact, paragraph 3 of HPD Form 396B applied and "inaccurate" information in that paragraph would not prejudice Respondent, because a driver who has been accurately informed "of the possibility of up to a four-year revocation for taking and failing a test—. . . would have been even more likely to refuse the test." (Emphasis omitted.) Second, the Director maintained that the court's finding that Respondent was prejudiced was "erroneous, because [Respondent] would never have consented to the test[,] . . . [inasmuch as] the defective form made it more likely [Respondent] would have consented to the test, and yet he still declined the test." (Emphasis omitted.) In his answering brief, Respondent maintained, as he had testified at the ADLRO hearing, that he had been misled by the advice in paragraph 4 of the form because, in light of the provisions of HRS § 286–256, "[i]f a driver takes and passes the test, that driver's license would not be revoked for life, even if such driver had had three or more prior alcohol enforcement contacts within a prior ten year period." (Emphases omitted.) Secondly, he asserted that "HPD–396B was deficient in [failing to] inform[ ][him] of the legal definition of 'alcohol enforcement contact[.]' "

In his reply brief, the Director maintained that Respondent was not prejudiced because (1) "despite the . . . defect encouraging the taking of the [BAC] test, [Respondent] still refused to take the test" (emphasis omitted),

(2) paragraph 4 is not applicable because Respondent in fact had only two prior contacts, (3) "[i]t is simply a matter of common sense that one must take a test and fail for one to receive the lifetime revocation," (4) Respondent "could have simply asked the officer to clarify" the meaning of alcohol enforcement contact, (5) "[b]ecause [Respondent] never asked, the officer never gave any misleading or incorrect answer," and (6) defining alcohol enforcement contact "would be counter productive because the warning form would become . . . excessively long."

In its May 7, 2001 decision, the ICA affirmed the reversal by the court. Relying on *Wilson's* approbation that "Hawaii's implied consent scheme *mandates* accurate warnings to enable the driver to knowingly and intelligently consent to or refuse a chemical alcohol test," ICA's opinion 98 Hawai'i at 55, 41 P.3d at 717, the ICA concluded (1) that "[t]he HPD–396B form statements regarding 'two prior alcohol enforcement contacts' misinformed [Respondent] that if he took a blood and/or breath test and failed it, he faced . . . revocation . . . for . . . two years" rather than two to four years, and (2) that the form was required to define "alcohol enforcement contact." *Id.* at 56, 41 P.3d at 718. Believing *Wilson* left open the "question of the defendant's reliance on and prejudice from . . . insufficient information . . . result[ing] in the absence of a knowing and intelligent consent[,]" the ICA adopted a four-part test for resolution of this question.[7]

## III.

The application for writ of certiorari was granted on May 22, 2001. In his application,

---

**6.** HRS § 286–256 (Supp.1999) states:

> **Immediate restoration of license.** If a test conducted in accordance with part VII and section 321-161 and the rules adopted thereunder shows that the arrestee's alcohol concentration was less than .08, the director or the arresting agency shall immediately return the arrestee's license along with a certified statement that administrative revocation proceedings have been terminated with prejudice.

(Boldfaced emphasis in original.)

**7.** The ICA said

> that the arrestee's reliance on misinformation . . . is proved when the following conditions are satisfied . . . :

1. Misinformation was given and/or a statute required the information to be given and the information was not given.
2. The misinformation and/or insufficient information was relevant and material to the arrestee's decision.
3. The State has not proved that the arrestee has admitted that he or she did not rely on the misinformation and/or insufficient information.
4. If given, the correct and/or sufficient information reasonably may have influenced a reasonable person to decide opposite of how the arrestee decided.

98 Hawai'i at 57, 41 P.3d at 719.

the Director asserts that "the absence of the definition of 'alcohol enforcement contact' on the warning form [should not result in] reversal of [Respondent]'s license revocation" and objects to "portions of the [ICA's] four-factor test[.]" As to his first contention, the Director reiterates the arguments set forth in his reply brief. As to the Director's second contention, a majority of this court decided in *State v. Garcia*, 96 Hawai'i 200, 29 P.3d 919 (2001), that the question perceived by the ICA as undecided had in fact been subsumed in the *Wilson* holding:

> "[T]he question of the defendant's reliance on and prejudice" from the faulty advice[,] *Santos v. Administrative Director of the Court*, 95 Hawai'i 86, 92, 18 P.3d 948, 954 (App.2001)[,] ... did not survive the holding in *Wilson*. Suppression [of the BAC results] rest[s] on the majority's belief that the misleading information legally precluded an arrestee from making "a knowing and intelligent decision regarding whether to consent to or refuse a blood test." *Wilson*, 92 Hawai'i at 52 n. 9, 987 P.2d at 275 n. 9. Consequently, prejudice inhered in the failure of the police to properly render a complete explanation of the penalties to the driver in the first place.... The inquiry suggested by the ICA in *Santos* would be incompatible with the *Wilson* rationale.

*Id.* at 207, 29 P.3d at 926 (brackets omitted). The four-factor test, therefore, did not survive *Wilson*. We agree with the ICA (1) that HPD Form 396–B misinformed Respondent as to the applicable revocation period for a driver who had two prior contacts and (2) that the phrase "prior alcohol enforcement contact" must be explained. However, while we conclude that Respondent's refusal to take a BAC test cannot be a ground for revocation of his license because of the failure to explain the meaning of "prior alcohol enforcement contact" and evidence thereof must be precluded, we additionally conclude that pre-arrest DUI evidence in this case independently supports Respondent's license revocation.

## IV.

Initially we observe, in consonance with Respondent's position, that the advice in paragraph 4 was misleading and confusing inasmuch as it informed a driver that, "if you refuse to take any tests," "three or more prior alcohol enforcement contacts" would result in revocation for life *"regardless of whether you take a test or not."* (Emphasis added.) The import of paragraph 4 was that the result of a test was irrelevant for purposes of the revocation period in the case of any driver who had three or more "contacts" prior to the arrest in issue. Paragraph 4 of HPD Form 396B was apparently intended to communicate the gist of HRS § 286–261(b)(4), which, at the time of the arrest, stated in pertinent part:

> (a) *Unless an administrative revocation is reversed* ... by the director....

> (b) The periods of administrative revocation which may be imposed under this part are as follows:

> ....

> (4) For life if the arrestee's driving record shows three or more *prior alcohol enforcement contacts* during the ten years *preceding the date of arrest* ....

> ....

> (c) The license of an arrestee who refuses to be tested after being informed of the sanctions of this part shall be revoked under subsection (b)(1), (2), or (3) for a period of one year, two years, and four years, respectively.

(Emphases added.) In HRS § 286–261(b)(4), the imposition of a lifetime revocation is qualified by the words "unless an administrative revocation is reversed ... by the director." As elucidated in the statute, a lifetime revocation becomes operative if the administrative revocation that stems from the arrest is sustained by the director and the arrestee had three prior enforcement contacts. Under HRS § 286–256, however, the director is mandated to "return the arrestee's license" and "certif[y] that administrative revocation proceedings have been terminated with prejudice" if "the arrestee's alcohol concentration was less than .08." The termination of such proceedings with prejudice *ipso facto* constitutes a HRS § 286–261(b)(4) reversal of "an administrative revocation" by the director.

In light of HRS §§ 286–256 and –261(b)(4), the advice that refusal would result in a lifetime revocation, "regardless of whether [Respondent] took the test or not," failed to correctly apprise Respondent that if he took the test and passed it, the sanction would not apply, but if he refused or failed the test, then the sanction would apply. In contradistinction to the statutes, the advice given by the arresting officer indicated it made no difference whether Respondent took the test or not.

### V.

Respondent's stated reliance on paragraph 4 of Form 396B stemmed from his misimpression that prior alcohol contacts included arrests. The arresting officer was also apparently under the same misimpression. In its ordinary sense the word "contact," as relevant to this context, means "a condition or an instance of meeting, connecting, or communicating[;] . . . an instance of establishing communication with someone . . . or of observing or receiving a significant signal from a person or object," *Webster's Third New Int'l Dictionary* 490 (1961), and is thus broad enough to include the circumstances of an arrest. Taken in conjunction, then, the words "prior alcohol enforcement contacts" would encompass arrests regarding enforcement of laws pertaining to alcohol use. In the absence of a further explanation in Form 396B, we conclude that the phrase "prior alcohol enforcement contacts" would incorporate and incorrectly connote, in a layperson's mind, arrests for DUI. An appropriate advisement as to the statutory meaning of this phrase by the arresting officer would have precluded this issue from arising.[8]

█ It is no answer that Respondent could have inquired as to the meaning of alcohol enforcement contacts. Contrary to the Director's argument, the obligation to accurate-ly inform a driver of the sanctions rests on the police; no obligation is imposed on the driver to make any inquiry. *See* HRS § 286–255.[9] Moreover, as given, the HPD Form 396B advice was not so ambiguous as to invite queries, especially in light of the prior paragraphs regarding other periods of revocation, *see supra* note 4, that informed the driver of the consequences of taking a test and refusing to take a test. Thus, Respondent's stated interpretation of paragraph 4 was not unreasonable. Nor do we consider the Director's contention that explaining prior alcohol enforcement contact would make the advice form "excessively" long, compelling. As suggested, an explanation of enforcement contacts can be summarily conveyed. *See supra* note 8.

### VI.

We cannot speculate, as the Director urges, as to what Respondent's response would have been had he been correctly advised of the meaning of enforcement contacts. But because Respondent was not correctly advised, "he did not make a knowing and intelligent decision [of] whether to exercise his statutory right of consent or refusal." *Wilson*, 92 Hawai'i at 51, 987 P.2d at 274 (citation omitted). "[T]he warnings given by the arresting officer [did not] afford[ ] [Respondent] the opportunity to make a knowing and intelligent decision [of] whether to take an evidentiary blood alcohol test." *Id.* at 50, 987 P.2d at 273. Accordingly, he "cannot be held to have made a knowing and intelligent decision whether to submit to an evidentiary alcohol test." *Id.* (citation omitted). His refusal, then, cannot be the basis for revocation. *See* HRS § 286–258(d)(3), and discussion, *infra*. As the Director concedes, "[Respondent] is correct that accurate information is required in refusal cases, too,

---

8. We do not mandate any particular language with respect to such a requirement. A description of such contacts would instruct that such contact refers to any Hawai'i administrative revocation and any Hawai'i, other state, or federal license suspension, revocation, or conviction for driving under the influence of alcohol or refusing to submit to a test for such influence.

9. HRS § 286–255 mandates in pertinent part:

**Arrest; procedures.** (a) Whenever a person is arrested for a violation of section 291–4 . . . [t]he arresting officer shall inform the person that the person has the option to take a breath test, a blood test, or both. The arresting officer also shall inform the person of the sanctions under this part, including the sanction for refusing to take a breath or a blood test.

such that a refusal induced by inaccurate information should not be used against a motorist. But in the case at bar, the refusal was not induced by the inaccurate information." (Emphases omitted.) Contrary to the Director's assertion, Respondent was not provided with accurate information and, in that event, he cannot be held to have had made a knowing or intelligent decision of whether to submit to or refuse a BAC test.

## VII.

■ Had Respondent been correctly advised as to the meaning of alcohol enforcement contacts, the information imparted by paragraph 3 would have been applicable. Paragraph 3 purported to describe the revocation period set forth in HRS § 286–261(b)(3). However, the revocation period for a driver who takes the test and fails it is not two years as stated on HPD Form 396B, but has been determined to be from two to four years. *See Gray v. Administrative Director of the Court, State of Hawai'i*, 84 Hawai'i 138, 160–61, 931 P.2d 580, 602–03 (1997). The information imparted by paragraph 3 was thus "inaccurate and misleading and did not fully inform [Respondent] of the legal consequences of submitting to a blood test." *Wilson*, 92 Hawai'i at 51, 987 P.2d at 274. We do not accept the Director's invitation to determine whether Respondent would have refused, in any event, to take the test if advised as stated on HPD Form 396B, because that would require speculation on our part, and would depart from the governing rule that "the misleading information legally preclude[s] an arrestee from making 'a knowing and intelligent decision regarding whether to consent to or refuse the blood test[,]' [and that] prejudice inhere[s] in the failure of the police to properly render a complete explanation of the penalties to the driver in the first place." *Garcia*, 96 Hawai'i at 207, 29 P.3d at 926 (quoting *Wilson*, 92 Hawai'i at 52 n. 9, 987 P.2d at 275 n. 9) (brackets omitted).

## VIII.

As previously recounted, the court dismissed the license revocation on the reasoning that had Respondent been properly advised, he might have taken the test and a test result of less than .08 would have resulted in dismissal of the proceedings with prejudice pursuant to HRS § 286–256. However, if we were to accept the court's analysis, we would have to assume that, had the driver been properly informed, he would have taken the test rather than refused it, and further predict that the test result would have been .08 or less, a two-step process supported only by conjecture. In any event, the evidence of intoxication, which the hearing officer found by a preponderance based on the arresting officer's observations prior to the arrest were unrelated to the defective warnings. Under such circumstances, the suppression of Respondent's refusal to take a BAC test as evidence supporting revocation cannot extend to evidence of intoxication that accrued prior to the arrest and the HRS § 286–255 mandated advice.[10]

## IX.

As we have said, the ADLRO hearing officer ruled that, "notwithstanding" Respondent's refusal to take a BAC test, "there existed [other evidence] by a preponderance of the evidence that [Respondent] drove, operated, or was in actual physical control[ ] of the motor vehicle while under the influence of intoxicating liquor[,]" and made supportive findings in support thereof. *See supra*.

■ On Respondent's appeal to the court, the court expressly "noted ... that ... the Director ... also found that [Respondent] drove, operated, or was in actual physical control of the motor vehicle while under the influence of alcohol" and that *Wilson* "does not affect or prevent a DUI finding based on police observations." We have observed that "HRS § 291–4 provides in the disjunctive that a person commits the offense if the person assumes control of a vehicle while under the influence of an intoxicating liquor *or* assumes control of a vehicle with a BAC level of .08 or more. Therefore, a charge of [DUI] may be proved under either of such

---

10. However, by virtue of its mandatory language, HRS § 286–256 plainly controls in driver revoca-

tion proceedings where test results of .08 or less are obtained.

alternative grounds." *Spock v. Administrative Director of Courts*, 96 Hawai'i 190, 193, 29 P.3d 380, 383 (2001) (emphasis in original) (citations omitted). As to the former, "relevant evidence of intoxication ... for the criminal offense of [DUI are] the manner in which [the driver] was observed to have driven his [or her] vehicle, his [or her] conduct in performing the requisite alcohol tests, his [or her] appearance, demeanor, and other valid police observations of signs of intoxication.'" *Id.* (quoting *Wilson*, 92 Hawai'i at 54 n. 14, 987 P.2d at 277 n. 14).

 Similarly, administrative license revocation is sustained if

[t]he evidence proves by a preponderance that the arrestee drove, operated, or was in actual physical control of the motor vehicle while under the influence of intoxicating liquor *or* while having a blood alcohol concentration of .08 or more *or* that the arrestee refused to submit to a breath or blood test after being informed of the sanctions of this part.

HRS § 286–258(d)(3) (emphases added). *See Wilson*, 92 Hawai'i at 52, 987 P.2d at 275 ("the administrative revocation statute and its criminal DUI counterpart are part and parcel of the same statutory scheme to prevent and address drunk driving" (citations omitted)). Thus, the basis for driver's license revocation may be established in any one of the three ways specified in HRS §§ 286–258(d)(3) and 259(e)(3) (Supp.2000) and any one of the three bases for revocation is a sufficient and "independent ground upon which to sustain revocation." *Spock*, 96 Hawai'i at 191, 29 P.3d at 380. Because there was a sufficient ground independent of Respondent's refusal to uphold revocation as stated in the Director's decision, that decision should have been affirmed by the court pursuant to HRS § 286–258(d)(3). *See* HRS § 286–260(c) (1993) ("The sole issues before

the [district] court shall be whether the director exceeded constitutional or statutory authority, erroneously interpreted the law, acted in an arbitrary or capricious manner, committed an abuse of discretion, or made a determination that was unsupported by the evidence in the record.").

## X.

For the foregoing reasons, we reverse the May 7, 2001 decision of the ICA, vacate the February 1, 2000 judgment of the court, and remand the case to the court to enter a judgment affirming the Director's November 29, 1999 decision.[11]

## Concurring Opinion by RAMIL, J.

Because there is a finding that "the arrestee drove, operated, or was in actual physical control of the motor vehicle while under the influence of intoxicating liquor," I concur with the result reached in this case.

## Concurring and Dissenting Opinion by NAKAYAMA, J.

I concur in part IX of the majority opinion affirming the Director's revocation of Castro's license under HRS § 286–258(d)(2). However for the reasons expressed in my dissent in *State v. Garcia*, 96 Hawai'i 200, 214, 29 P.3d 919, 933 (2001) (Nakayama, J., with whom Ramil J., joins, dissenting), and *infra*, I believe that *State v. Wilson*, 92 Hawai'i 45, 987 P.2d 268 (1999), was wrongly decided and should be overruled. Therefore, I would affirm the Director's findings of fact, conclusions of law and decision revoking Castro's license.

Because of the majority's continuing expansion of the supervisory powers doctrine, I am compelled to once again voice my concerns.[1] Supervisory powers should be invoked sparingly and only in great necessity.[2]

---

**11.** As pointed out by the Director, "[t]he revocation period should be extended beyond the current November 24, 2003 ending date to take into account the fact that [Respondent] has been allowed to drive ever since the [d]istrict [c]ourt reversed the ADLRO's license revocation."

**1.** See *In re Doe*, 96 Hawai'i 217, 224, 30 P.3d 231, 238 (2001) (Nakayama J., with whom Ramil J., joins, dissenting), *Garcia*, 96 Hawai'i at 214,

29 P.3d at 933 (Nakayama J., with whom Ramil J., joins, dissenting), and *Wilson*, 92 Hawai'i at 54, 987 P.2d at 277 (Nakayama J., with whom Ramil J., joins, dissenting) for each of my dissents in response to this line of cases.

**2.** Supervisory powers are derived from HRS § 602–4 (1993) which states "[t]he supreme court shall have the general superintendence of all courts of inferior jurisdiction to prevent and

Thus, the evolution of this court's implementation of the supervisory powers doctrine warrants examination. In *State v. Pattioay,* 78 Hawai'i 455, 468 n. 28, 896 P.2d 911, 924–25 n. 28 (1995) this court expressly stated that "the court's inherent powers 'must be exercised with restraint and discretion' and only in exceptional circumstances." (quoting *Kukui Nuts of Hawaii, Inc. v. R. Baird & Co., Inc.,* 6 Haw.App. 431, 436, 726 P.2d 268, 272 (1986)). Necessity, according to the *Pattioay* court, is indispensable to the "legitimate exercise" of these powers. *Id.* at 468 n. 28, 896 P.2d at 925 n. 28.

In *Pattioay,* necessity was found after a lengthy discussion of the Posse Comitatus Act (PCA)[3] and the conclusion that federal law had been unequivocally violated. The PCA is a federal statute prohibiting "direct participation by a member of the [armed services] in a search, seizure, arrest or other similar activity unless participation in such activity is otherwise authorized by law." *Pattioay,* 78 Hawai'i at 460, 896 P.2d at 916 (quoting 10 U.S.C. § 375 (1988)). Violation of this statute results in a fine or imprisonment. The *Pattioay* court stated that although it was exercising supervisory power "in this case" and "in this instance," it was by no means setting forth a rule that was to be broadly interpreted.

Two Justices[4] concurred in that decision, presenting salient reasons behind the exercise of supervisory powers in that instance. Most notably, Justice Ramil recalled this country's "antipathy toward the use of the military in civilian law enforcement" and placed it in the context of Hawai'i's history under martial law. *Id.* at 471–72, 896 P.2d at 927–28 (Ramil, J., with whom Moon, C.J., joins, concurring). Given the combined force of the unlawful conduct and Hawai'i's unique history, this court properly exercised its supervisory power in suppressing *illegally* obtained evidence.

*Wilson,* contrary to the cautionary language of *Pattioay,* contains no explanation of this court's exercise of its supervisory powers. The majority in *Wilson,* expanded the narrow application of *Pattioay* in but two sentences of a footnote. The majority suggested that *Pattioay* stood for the broad principle that "[t]his court has previously indicated that the exclusion of evidence based on a statutory violation is proper under appropriate circumstances." *Wilson,* 92 Hawai'i at 52 n. 10, 987 P.2d at 275 n. 10. Without any analysis, this court quickly concluded that the exercise of its power was appropriate.

The statute at issue in *Wilson,* HRS § 286–151, is also the statute at issue in the case *sub judice.* HRS § 286–151[5] sets forth

---

correct errors and abuses therein where no other remedy is expressly provided by law." Inherent powers, on the other hand are derived from the Constitution. In *State v. Harrison,* 95 Hawai'i 28, 32, 18 P.3d 890, 894 (2001) this court stated:

> courts have inherent equity, supervisory, and administrative powers as well as inherent power to control the litigation process before them. Inherent powers of the court are derived from the state Constitution and are not confined by or dependent on statute. Among courts' inherent powers are the powers to create a remedy for a wrong even in the absence of specific statutory remedies, and to prevent unfair results. The courts also have inherent power to curb abuses and promote a fair process which extends to the preclusion of evidence and may include dismissal in severe circumstances.

In *Pattioay,* this court stated that "the courts of this State have the *inherent supervisory* power over criminal prosecutions to ensure that evidence illegally obtained by government officials or their agents is not utilized in the administration of criminal justice through the courts." *Pattioay,* 78 Hawai'i at 468, 896 P.2d at 924. The court combined the two sources of power into a single phrase. In *Wilson,* this court further combined the concepts such that the court now refers to its "supervisory powers."

3. 18 United States Code (U.S.C.) § 1385 (1988).

4. *Pattioay,* 78 Hawai'i at 470, 896 P.2d at 926 (Ramil, J., with whom Moon, C.J., joins, concurring).

5. HRS § 286–151 provides in relevant part:

> (a) Any person who operates a motor vehicle or moped on the public highways of the State shall be deemed to have given consent, subject to this part, to a test or tests approved by the director of health of the person's breath, blood, or urine for the purpose of determining alcohol concentration or drug content of the person's breath, blood, or urine, as applicable.
> ....
> (2) The person has been informed by a police officer of the sanctions under part XIV and sections 286–151.5 and 286–157.3.

the implied consent law under Hawai'i law. The law provides that by operating a motor vehicle the driver is "deemed to have given consent" to the test (or tests) for measuring BAC. HRS § 286–151. The arrestee may "refuse" [6] to physically comply with the testing procedure. HRS § 286–151.5. Finally, the police officer is merely required to inform the arrestee of the sanctions for refusal.[7] Failure to perform this duty is not unlawful, nor does the statute provide for fines or imprisonment.

Comparing the circumstances under which we exercised supervisory powers in *Pattioay* with *Wilson*, the absence of necessity in *Wilson* is glaring. In *Pattioay*, a federal law prohibited military participation in civilian law enforcement, the violation of which resulted in specific consequences, fine or imprisonment. In *Wilson*, the state statute at issue required a police officer to inform the arrestee of the sanctions if the arrestee physically refused to take a breath or blood test for the presence of alcohol. *Wilson*, 92 Hawai'i at 49, 987 P.2d at 272. The failure to provide the arrestee with a catalogue of the legal consequences of his decision is not ille-

gal conduct.[8] Nor does the statute provide for imprisonment, much less a fine.

In my dissent in *Wilson*, I questioned the propriety of exercising our supervisory powers and noted the majority's failure to "address the analysis of the *Pattioay* decision, or explain why the supposed statutory violation in this case falls within the exception to the general rule limiting the suppression remedy to constitutional violations." *Wilson*, 92 Hawai'i at 59 n. 5, 987 P.2d at 282 n. 5.

Rectifying its failure to adequately apply the principles of *Pattioay* in *Wilson*, the majority of this court used *Garcia* as its vehicle for a post facto discussion of its *Wilson* reasoning. The majority concluded that its decision in *Wilson* was "based at least in part in maintaining the integrity of the judicial system." *Garcia*, 96 Hawai'i at 206, 29 P.3d at 925. Rather than apply that concern to the facts, the majority simply provided a string cite of cases discussing judicial integrity.[9] In no way did the majority explain how this court's integrity was at stake in *Wilson* or why conduct that is not unlawful necessitates application of the exclusionary rule.

**6.** Blacks Law Dictionary provides that "refusal implies the positive denial of an application or command, or at least a mental determination not to comply." Blacks Law Dictionary (6th ed.) at 887.

**7.** The statutory language enacting Hawai'i's highway safety program neither expressly nor impliedly provides that an arrestee may withdraw his or her consent. The driver may, however, physically refuse to be tested, the result of which is a sanction. Despite undergoing many amendments since its enactment in 1967, the legislature never added language giving the driver the option to withdraw consent.

**8.** It's worth pointing out that even a *Miranda* warning, a right of constitutional dimensions, does not require that the arrestee be educated regarding the consequence of his or her decision to remain silent. *See Oregon v. Elstad*, 470 U.S. 298, 317, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (stating "we have not held that the *sine qua non* for a knowing and voluntary waiver of the right to remain silent is a full and complete appreciation of all of the consequences flowing from the nature and quality of the evidence in the case.").

**9.** In *Garcia*, the majority cited to three Hawai'i cases in support of its statement that the exclu-

sionary rule may be employed to ensure the maintenance of judicial integrity. Although it is true that the cases cited by the *Garcia* majority do discuss judicial integrity, the majority failed to acknowledge that each of these cases also stand for the proposition that our supervisory powers should not be invoked unless and until illegal conduct that threatens the very fairness of the judicial proceedings is evident. *See State v. Bridges*, 83 Hawai'i 187, 196, 925 P.2d 357, 366 (1996) (stating that the issue was whether evidence obtained by non-constitutional violation in another jurisdiction should be admitted in a criminal proceeding in the forum jurisdiction. In defining the primary purpose of the exclusionary rule, the *Bridges* court stated that "[o]f course, when evidence is not obtained illegally, 'no loss of judicial integrity is implicated in a decision to admit the evidence.'"); *State v. Bowe*, 77 Hawai'i 51, 60, 881 P.2d 538, 547 (1994) (holding "that official police coercion is not a necessary predicate to finding that a confession is involuntary under article I, sections 5 and 10 of the Hawai'i Constitution."); and *State v. Augafa*, 92 Hawai'i 454, 470, 992 P.2d 723, 739 (App.1999) (concluding that "the police did not act illegally in arresting Defendant and in seizing the drugs. Since there was no illegal conduct by the officers …, there was no threat of unfair process that would require suppression of the evidence.").

In *Wilson,* I cautioned against an over broad interpretation of this court's supervisory powers. I recommended a case by case analysis so that both fairness and due process concerns could be adequately evaluated to determine whether exceptional circumstances existed warranting the use of our supervisory powers. My concerns centered on the fact that failure to complete such an analysis would lead to the development of inconsistent law based in part upon this court's judgment of what the law should be rather than what the law is.

My concerns were validated in *State v. Edwards,* 96 Hawai'i 224, 232, 30 P.3d 238, 246 (2001). This court departed from the long held rule that the proponent of a motion to suppress evidence has the burden of proving that (1) evidence was unlawfully secured and (2) that a *constitutional* right was violated. *Pattioay,* 78 Hawai'i at 466, 896 P.2d at 922. At issue in *Edwards* was HRS § 803–9(2) (1993)[10] which requires the police to make a reasonable effort to contact an arrestee's counsel when requested. The language of HRS § 803–9 is important because, like *Pattioay* and unlike *Wilson* and *Garcia,* the statute at issue states that the police act *unlawfully* if they fail to make a reasonable effort to contact the requested counsel. We held the police did not make a reasonable effort to contact Edward's counsel. Despite this, this court did not exercise its supervisory powers. The defendant argued this court should exercise its supervisory powers and suppress her statements made without the aid of counsel. We declined, stating that in the absence of misconduct of constitutional dimensions, evidence is not "per se inadmissible." *Edwards,* 96 Hawai'i at 237–38, 30 P.3d at 251–51. We then determined that Edwards failed to make a connection between the evidence to be suppressed and the statutory violation. I agreed that this court should not exercise its supervisory powers because the violation was statutory and no

constitutional right was in danger of being trammeled.

Where *Edwards* becomes problematic is that in explaining the application of the exclusionary rule, this court stated that, "[t]he proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his or her own ... rights were violated." *Edwards,* 96 Hawai'i at 232, 30 P.3d at 246 (quoting *State v. Augafa,* 92 Hawai'i 454, 464, 992 P.2d 723, 733 (App.1999) (quoting *State v. Balberdi,* 90 Hawai'i 16, 21, 975 P.2d 773, 778 (App.1999) (quoting *State v. Anderson,* 84 Hawai'i 462, 467, 935 P.2d 1007, 1012 (1997)))). The *Anderson* opinion, expressly stated that the proponent must prove that his own "Fourth Amendment" rights were violated. *Anderson,* 84 Hawai'i at 467, 935 P.2d at 1012. *Balberdi* also retains the words "Fourth Amendment." *Balberdi,* 90 Hawai'i at 21, 975 P.2d at 778. *Augafa* appears to be the first case deleting the vital words conveying the rule that a right of constitutional dimensions must be violated.[11] No other case in this court's history put forth the incredible proposition that one need only prove that *a* right, as opposed to a constitutional right, has been violated in order to warrant suppression.

In this case, the majority perpetuates this inconsistent line of reasoning. Here, the defendant pushed the form 396B away and interrupted the officer's recital of its content. The defendant stated that he refused to take the intoxilyzer test. The officer persisted and completed reading the form aloud to the defendant. The defendant never asked the officer what the phrase "prior alcohol contacts" meant. The defendant had two prior convictions for violating HRS § 291–4 and was undoubtedly aware that sanctions existed if he refused to take the test. It is not

---

10. HRS § 803–9(2) provides:
 To unreasonably refuse or fail to make a reasonable effort, where the arrested person so requests and prepays the cost of the message, to send a telephone, cable, or wireless message through a police officer or another than the arrested person to the counsel or member of the arrested person's family[.]

11. It is interesting that Justice Acoba chose to quote that particular phrase from *Augafa* with the constitutional violation omitted. *Augafa* and *Balberdi* were authored by Justice Acoba when he was a member of the Intermediate Court of Appeals.

statutorily required that he appreciate, much less know, all the possible consequences emanating from his decision. Moreover, the officer engaged in no unlawful conduct. Invoking our supervisory powers because a defendant was not informed of every potential consequence for physical refusal of the BAC test strays far indeed from the exceptional circumstances envisioned in *Pattioay*.

*Wilson, Garcia, Edwards,* and now this case, demonstrate the dangers associated with not adhering closely to the cautionary language of *Pattioay.* The majority inconsistently applies the exercise of our supervisory powers. Accordingly, I dissent from sections III–VII of the majority's opinion in which it exercises this court's supervisory power in suppressing evidence obtained in the absence of a constitutional violation.